**No. 25-2231**

# In the United States Court of Appeals for the First Circuit

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS –
HARVARD FACULTY CHAPTER; AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS; INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF JUSTICE;
*(Caption continued on inside cover)*

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, NO. 1:25-CV-10910
HON. ALLISON D. BURROUGHS

## BRIEF FOR PLAINTIFFS-APPELLEES

PHILIPPE Z. SELENDY
JULIE R. SINGER
COREY STOUGHTON
DRAKE REED
AINE C. CAROLAN
SELENDY GAY PLLC
1290 Ave. of the Americas
New York, NY 10104
(212) 390-9000

JOSEPH M. SELLERS
PHOEBE M. WOLFE
SABRINA S. MEROLD
COHEN MILSTEIN SELLERS & TOLL
   LLP
1100 New York Ave. NW, Suite 800
Washington, DC 20005
(202) 408-4600

ELIZABETH B. PRELOGAR
   *Counsel of Record*
EPHRAIM A. MCDOWELL
JOSHUA REVESZ
ELIAS S. KIM
COOLEY LLP
1299 Pennsylvania Ave. NW
Suite 700
Washington, DC 20004
(202) 842-7800

DIANA G. LI
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

*Counsel for Plaintiffs-Appellees*

(*caption continued*)

LEO TERRELL, in the official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism; UNITED STATES DEPARTMENT OF EDUCATION; CRAIG TRAINOR, in the official capacity as Acting Assistant Secretary for the Office for Civil Rights, U.S. Department of Education; ELIZABETH MERRILL BROWN, in the official capacity as General Counsel of the U.S. Department of Education; ROBERT F. KENNEDY, JR., in the official capacity as the U.S. Secretary of Health and Human Services; MICHAEL B. STUART, in the official capacity as General Counsel of the U.S. Department of Health and Human Services; JAYANTA BHATTACHARYA, in the official capacity as the Director of the National Institutes of Health; EDWARD FORST, in the official capacity as Administrator of the U.S. General Services Administration; JOSH GRUENBAUM, in the official capacity as Commissioner of the Federal Acquisition Service; TODD BLANCHE, in the official capacity as Acting U.S. Attorney General; LINDA MCMAHON, in the official capacity as the U.S. Secretary of Education; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); NATIONAL INSTITUTES OF HEALTH; UNITED STATES GENERAL SERVICES ADMINISTRATION; BRIAN STONE, in the official capacity as Acting Director of NSF; JARED ISAACMAN, in the official capacity as Administrator of NASA; UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; UNITED STATES DEPARTMENT OF ENERGY; UNITED STATES NATIONAL SCIENCE FOUNDATION; BROOKE L. ROLLINS, in the official capacity as Secretary of U.S. Department of Agriculture; UNITED STATES DEPARTMENT OF AGRICULTURE; SCOTT TURNER, in the official capacity as Secretary of HUD; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; CHRISTOPHER A. WRIGHT, in the official capacity as Secretary of Department of Energy; PETER B. HEGSETH, in the official capacity as Secretary of Department of Defense,

*Defendants-Appellants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees American Association of University Professors – Harvard Faculty Chapter; American Association of University Professors; and International Union, United Automobile, Aerospace & Agricultural Implement Workers of America certify that they are non-profit organizations, that they have no parent companies, and that they have not issued shares of stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................... 1

STATEMENT OF THE CASE .................................................................... 5

    A.    The Trump Administration's Attempt to Defund
          Harvard University .......................................................................... 5

          1.    The April 3 Letter ............................................................ 6

          2.    The April 11 Letter ......................................................... 8

          3.    The April 14 Freeze Order ............................................. 9

          4.    The May 5 Freeze Order and Subsequent
                  Termination Letters ...................................................... 11

    B.    The Funding Termination's Devastating Effects on
          Plaintiffs ........................................................................................ 13

    C.    Plaintiffs' Suit and Proceedings Below ................................. 16

SUMMARY OF THE ARGUMENT ......................................................... 18

ARGUMENT ............................................................................................... 20

I.    The district court properly exercised jurisdiction over the
    termination letters. ........................................................................... 20

    A.    Plaintiffs' First Amendment and Title VI claims fall
          outside of the Tucker Act's scope ............................................ 23

          1.    First Amendment claims do not depend on the
                  existence of a contract .................................................. 23

          2.    Congress independently conferred district-court
                  jurisdiction over Title VI funding-termination
                  claims ............................................................................... 32

    B.    Because plaintiffs are not parties to Harvard's
          contracts, the Tucker Act does not govern their suit. ......... 37

II.    The funding termination violates the First Amendment. ............. 41

    A.    The government may not coerce a university to alter
          expression on its campus. ........................................................... 41

**TABLE OF CONTENTS** – continued

**Page**

B.    The government terminated Harvard's grants in an effort to alter expression on Harvard's campus...................44

    1.    The government's communications focus on Harvard's protected expression....................................46

    2.    The government's contrary arguments defy the record.........................................................................50

III.    The funding termination violates Title VI. ...................................56

A.    The government terminated Harvard's federal funds without providing the process that Title VI requires..........57

B.    No other source of authority permits the government's defunding...............................................................61

CONCLUSION ...................................................................................67

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ........................................................................ 41

*AAUP v. DOJ,*
   2025 WL 1684817 (S.D.N.Y. June 15, 2025) ..................................... 66

*AAUP v. Trump,*
   815 F. Supp. 3d 907 (N.D. Cal. 2025) .................................... 39, 58, 66

*Adams v. Bell,*
   711 F.2d 161 (D.C. Cir. 1983) ........................................................... 33

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ..................................................................... 57, 61

*Am. Council of Learned Societies v. NEH,*
   2026 WL 1256545 (S.D.N.Y. May 7, 2026) ........................................ 63

*Am. Pub. Health Ass'n v. NIH,*
   145 F.4th 39 (1st Cir. 2025) .............................................................. 28

*Am. Textile Mfrs. Inst., Inc. v. Donovan,*
   452 U.S. 490 (1981) .......................................................................... 62

*Axon Enters., Inc. v. FTC,*
   598 U.S. 175 (2023) .......................................................................... 27

*Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer,*
   610 F.2d 621 (9th Cir. 1979) ............................................................. 35

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) ...................................................................... 42, 54

*Barton v. Clancy,*
   632 F.3d 9 (1st Cir. 2011) .............................................................24-25

*Bd. of Cnty. Comm'rs v. Umbehr,*
   518 U.S. 668 (1996) .......................................................................... 43

iv

# TABLE OF AUTHORITIES – continued

**Page(s)**

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ............................................................. 21

*Bowen v. Mich. Acad. of Fam. Physicians,*
476 U.S. 667 (1986) ............................................................ 40

*Branch v. Umphenour,*
936 F.3d 994 (9th Cir. 2019) ........................................... 64-65

*Califano v. Sanders,*
430 U.S. 99 (1977) ............................................................. 40

*California v. U.S. Dep't of Educ.,*
132 F.4th 92 (1st Cir. 2025) ............................................. 28

*Chancellor Manor v. United States,*
331 F.3d 891 (Fed. Cir. 2003) .......................................... 38

*Chicago Transit Auth. v. U.S. Dep't of Transp.,*
824 F. Supp. 3d 677 (N.D. Ill. 2026) ................................ 33

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ........................................................... 66

*Cienega Gardens v. United States,*
194 F.3d 1231 (Fed. Cir. 1998) ........................................ 38

*City of Providence v. Barr,*
954 F.3d 23 (1st Cir. 2020) .............................................. 64

*Climate United Fund v. Citibank, N.A.,*
154 F.4th 809 (D.C. Cir. 2025) ........................................ 29

*Cmty. Legal Servs. in E. Palo Alto v. HHS,*
137 F.4th 932 (9th Cir. 2025) .......................................... 39

*Cmty. Legal Servs. in E. Palo Alto v. HHS,*
155 F.4th 1099 (9th Cir. 2025) ........................................ 39

**TABLE OF AUTHORITIES** – continued

**Page(s)**

*Colwell v. HHS,*
   558 F.3d 1112 (9th Cir. 2009) ............................................... 33

*Crowley Gov't Servs., Inc. v. GSA,*
   38 F.4th 1099 (D.C. Cir. 2022) ............................................. 37

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ......................................................... 56, 62

*Dep't of Educ. v. California,*
   604 U.S. 650 (2025) ............................................... 22, 25, 32

*DHS v. Regents of Univ. of Cal.,*
   591 U.S. 1 (2020) ............................................................... 54

*Director, Off. of Workers' Comp. Programs v. Newport News*
   *Shipbuilding & Dry Dock Co.,*
   514 U.S. 122 (1995) ........................................................... 60

*First Choice Women's Res. Ctrs., Inc. v. Davenport,*
   146 S. Ct. 1114 (2026) ....................................................... 26

*Freeman v. Cavazos,*
   923 F.2d 1434 (11th Cir. 1991) ........................................... 36

*Gardner v. Alabama,*
   385 F.2d 804 (5th Cir. 1967) ............................................... 36

*Gorss Motels, Inc. v. Safemark Sys., LP,*
   931 F.3d 1094 (11th Cir. 2019) ........................................... 64

*Houston Cmty. Coll. Sys. v. Wilson,*
   595 U.S. 468 (2022) ....................................................... 41-42

*Ingersoll-Rand Co. v. United States,*
   780 F.2d 74 (D.C. Cir. 1985) ............................................... 34

*Jenner & Block LLP v. DOJ,*
   784 F. Supp. 3d 76 (D.D.C. 2025) ................................... 46, 50

**TABLE OF AUTHORITIES** – continued

**Page(s)**

*JKB Sols. & Servs., LLC v. United States,*
170 Fed. Cl. 241 (Fed. Cl. 2024) ....................................................... 29

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
385 U.S. 589 (1967) ...................................................................... 1, 4, 42

*Khalil v. Trustees of Columbia Univ. in City of N.Y.,*
2026 WL 775813 (S.D.N.Y. Mar. 19, 2026)................................... 25, 39

*Lozman v. Riviera Beach,*
585 U.S. 87 (2018) ............................................................................. 46

*Mahmoud v. Taylor,*
606 U.S. 522 (2025) ........................................................................... 26

*Manhattan Cmty. Access Corp. v. Halleck,*
587 U.S. 802 (2019) ........................................................................... 55

*Megapulse, Inc. v. Lewis,*
672 F.2d 959 (D.C. Cir. 1982) .................................................21, 24-25

*Metro. Transp. Auth. v. Duffy,*
2026 WL 588117 (S.D.N.Y. Mar. 3, 2026)...................................39-40

*Moody v. NetChoice LLC,*
603 U.S. 707 (2025) ........................................................................... 43

*Morton v. Mancari,*
417 U.S. 535 (1974) ........................................................................... 65

*N.Y. Rep. State Comm. v. SEC,*
799 F.3d 1126 (D.C. Cir. 2015) ........................................................ 27

*Nat'l Rifle Ass'n of Am. v. Vullo,*
602 U.S. 175 (2024) .......................................................42, 44-45, 50

*New York v. Trump,*
171 F.4th 1 (1st Cir. 2026).............................................................29-30

# TABLE OF AUTHORITIES – continued

**Page(s)**

*New York v. Trump*,
769 F. Supp. 3d 119 (D.R.I. 2025) ..................................................... 30

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ................................................................... 44-46

*NIH v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ............................................................. 25, 28-29

*Pernell v. Fla. Bd. of Governors of State Univ.*,
2026 WL 1955783 (11th Cir. July 7, 2026) ......................................... 43

*Perry v. Sindermann*,
408 U.S. 593 (1972) ................................................................ 24, 44-45

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ..................................................................... 26

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .................................................................... 24, 42

*Schlafly v. Volpe*,
495 F.2d 273 (7th Cir. 1974) ............................................................ 33

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ...................................................................... 62

*Sergent's Mech. Sys., Inc. v. United States*,
157 Fed. Cl. 41 (Fed. Cl. 2021) ........................................................ 27

*Solutions in Hometown Connections v. Noem*,
165 F.4th 835 (4th Cir. 2026) ........................................................... 31

*Solutions in Hometown Connections v. Noem*,
2025 WL 1530318 (D. Md. May 29, 2025) ........................................... 31

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) .......................................................... 34

viii

**TABLE OF AUTHORITIES** – continued

**Page(s)**

*Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
   158 F.4th 1 (1st Cir. 2025)..........................................................42

*Stephens v. United States*,
   165 Fed. Cl. 341 (Fed. Cl. 2023) ..............................................26

*Sustainability Inst. v. Trump*,
   784 F. Supp. 3d 861 (D.S.C. 2025) ...........................................31

*Sustainability Inst. v. Trump*,
   165 F.4th 817 (4th Cir. 2026) ...............................................30-31

*Swain Cnty. v. United States*,
   2017 WL 1488808 (Fed. Cl. Apr. 26, 2017) ..............................27

*Sweezy v. New Hampshire ex rel. Wyman*,
   354 U.S. 234 (1957) ...............................................................2, 43

*Tennessee v. Dep't of Educ.*,
   104 F.4th 577 (6th Cir. 2024) ...............................................34, 36

*Thakur v. Trump*,
   176 F.4th 1187 (9th Cir. 2026) ..............................................39, 55

*Todd v. United States*,
   386 F.3d 1091 (Fed. Cir. 2004) ..................................................26

*Tootle v. Secretary of Navy*,
   446 F.3d 167 (D.C. Cir. 2006) ....................................................37

*Washington v. U.S. Dep't of Educ.*,
   2025 WL 2966255 (W.D. Wash. Oct. 21, 2025)..........................40

ix

# TABLE OF AUTHORITIES – continued

**Page(s)**

**Statutes**

5 U.S.C.
§ 554(a) ..............................................................................58
§ 556....................................................................................58
§ 557....................................................................................58
§ 704....................................................................................40

20 U.S.C. § 1683...................................................................34

28 U.S.C. § 1491(a)(1)..........................................................21

42 U.S.C.
§ 2000d.........................................................32, 57, 59, 63
§ 2000d-1 ......................................................10, 57-58, 63
§ 2000d-2 .......................................................33, 36-37, 40

## Other Authorities

2 C.F.R. § 200.340(a)(4) .................................................. 61, 64

34 C.F.R. § 100.3...................................................................57

45 C.F.R. § 80.3.....................................................................57

110 Cong. Rec. 7059 (1964) ............................................. 58, 65

89 Fed. Reg. 80055 (Oct. 2, 2024) .........................................62

Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025).......................5

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Plaintiffs agree that oral argument is appropriate given the significant stakes of this controversy.

## INTRODUCTION

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). And if academic freedom means anything at all, it means that the government cannot punish a university—or its faculty and researchers—because it does not like who teaches and what is taught on the university's campus.

The Executive Branch actions challenged here severely threaten that principle. The government demanded that Harvard University "reduc[e] the power held by faculty" the government disliked. JA393. It demanded that Harvard's academic departments "hir[e] a critical mass of new faculty" and "admit[] a critical mass of students" whose views the Administration preferred. JA395. It demanded that Harvard "shutter" specific academic programs that the government asserted "fuel[] division and hatred." JA392. And when Harvard refused, the government lambasted the university's faculty as "woke, Radical Left, idiots, and 'bird-brains'" who "teach[] Hate and Stupidity" and "encourage resentment and instill grievance and racism into our wonderful young

Americans." JA336-37, JA401.  The government then stripped Harvard of billions of dollars of federal funding that supported faculty members' research vital to public health, technological innovation, and American economic competitiveness.

In a thorough opinion, the district court declared the government's actions unlawful.  The court recognized that the First Amendment prohibits the government from using its vast powers to retaliate against or coerce speech.  And it found that the statements above—and many others—confirm that the government took aim at Harvard based on disagreement with the ideologies of its community members.  The Constitution prohibits that "governmental intervention in the intellectual life of a university." *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring in the result).

On appeal, the government hides its head in the sand.  It hardly acknowledges the statements and conduct of federal officials that doom the government's case.  Instead, it repeats a mantra: The Administration did not defund Harvard because (in the Secretary of Education's words) it was "teaching ideologies," JA338, but solely because of unspecified and

2

unproven concerns about Harvard's alleged tolerance of antisemitism. That version of the facts finds no support in the record. And even if the Administration acted against Harvard because of concerns about discrimination, the government's actions are still unlawful: A federal statute—Title VI—places procedural restrictions on the government's ability to yank federal funding due to such concerns, but the government complied with none of those protections here.

Unable to seriously defend its actions on the merits, the government relies heavily on its jurisdictional playbook, claiming that only the Court of Federal Claims can adjudicate plaintiffs' First Amendment and Title VI claims. That objection is wrong twice over. To begin, plaintiffs' claims are not the sort of disguised contractual claims that must be brought in the claims court: The First Amendment claim does not depend on the existence of a contract, and Congress spoke clearly that the Title VI claim should be heard in district court. In addition, the plaintiffs in this action—associations and unions representing faculty members, graduate students, and other university workers—are not parties to the underlying grants, so their claims cannot be brought under the Tucker Act. The government cites no case in which any appellate

3

court has directed a First Amendment or Title VI challenge to the Court of Federal Claims. This Court should not break new ground, especially where the parties lack the requisite relationship for contract claims.

At bottom, the government's arguments all suffer from a common flaw. Because "[t]he classroom is peculiarly the 'marketplace of ideas,'" "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Keyishian*, 385 U.S. at 603 (quoting *Sweezy*, 354 U.S. at 250). The government's merits arguments defy that rule by asserting the prerogative to defund a university based on the ideas found there—or, alternatively, based on evidence-free allegations of discrimination untested by congressionally mandated procedures. And the government's jurisdictional arguments would produce the same harms another way, by precluding faculty members from vindicating their rights until long after protected speech has been chilled. The district court correctly rejected the government's efforts to "cast a pall of orthodoxy over the classroom." *Id.* This Court should affirm that judgment.

4

## STATEMENT OF THE CASE

### A.    The Trump Administration's Attempt To Defund Harvard University

At the start of his second term, President Donald J. Trump issued an Executive Order promising to investigate antisemitism "on university and college campuses."  Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025); *see* JA300.  A few weeks later, the Department of Justice announced the creation of a multi-agency "Task Force to Combat Anti-Semitism," led by Defendant Leo Terrell, to carry out the Order.  JA301. The Task Force includes representatives from the Department of Justice, the Department of Education, the Department of Health and Human Services (HHS), and the General Services Administration (GSA).  *Id.*

From the beginning, the Task Force made clear that its aims included controlling what is taught on university campuses.  In March 2025, Terrell declared on Fox News that "[t]he academic system in this country has been hijacked by the left, has been hijacked by the Marxists. They have controlled the mindset of our young people."  JA302.  "[W]e have to put an end to it," he continued: "We are going to bankrupt these universities.  We are going to take away every single federal dollar."  *Id.*

That same month, the Task Force came to Harvard University. On March 10, the Department of Education sent a letter to Harvard and 59 other schools "warning them of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus." JA303. And on March 31, a GSA official announced that the Task Force would review Harvard's federal grants and contracts. JA389.

### 1.   *The April 3 Letter*

Three days later, the Task Force sent a "formal communication" to Harvard's President. JA391. That April 3 letter charged that Harvard "has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964." *Id.* The letter outlined "several broad, non-exhaustive areas of reform" that the government "regard[ed] as necessary for Harvard University's continued financial relationship with the United States government." *Id.*

Those proposed "reforms" touched on virtually every aspect of Harvard's academic governance. The first demand was that "[p]rograms and departments that fuel antisemitic harassment must be reviewed and

necessary changes made to address bias, improve viewpoint diversity, and end ideological capture." *Id.* The letter also demanded that Harvard overhaul student discipline to ensure that "senior administrative leaders are responsible for final decisions"; hold student groups accountable for unspecified "violations of Harvard policy"; and enact a "comprehensive mask ban." JA391-92. Finally, the letter insisted that Harvard "shutter" all "DEI programs," charging that they "teach students, faculty, staff, and leadership to make snap judgments about each other based on crude race and identity stereotypes." JA392. The letter concluded by stating that the Task Force "expect[ed]" Harvard's "immediate cooperation in implementing these critical reforms that will enable Harvard to return to its original mission of providing a high-quality education in a safe environment." *Id.*

Contemporaneously with the April 3 letter, an HHS official sent counsel for Harvard a less formal communication echoing similar demands. JA306-09. That communication identified specific departments that required oversight and review, such as the "Center for Middle East Studies" and the "Department of Near Eastern Languages and Civilizations." JA308. And it explained that the university faced a

"CHOICE" between "install[ing] new leadership in problematic depts" and "receivership." *Id.*

### 2.    *The April 11 Letter*

Eight days later, the Task Force sent Harvard another letter, which stated that it "incorporates and supersedes the terms of the federal government's prior letter of April 3, 2025." JA393. The April 11 letter asserted that Harvard had "failed to live up to both the intellectual and civil rights conditions that justify federal investment," apparently because it had succumbed to "ideological capture." *Id.* The letter thus "present[ed]" a series of "provisions as the basis for an agreement in principle that will maintain Harvard's financial relationship with the federal government." *Id.*

Like the April 3 letter, the April 11 letter's demands sought to control who teaches and what is taught at Harvard. The letter demanded (among other things) that Harvard "reduc[e] the power held by faculty … more committed to activism than scholarship"; "reform[]" its academic programming by hiring faculty and admitting students based on "viewpoint diversity"; "prevent admitting students hostile" to "American values and institutions"; "review[]" all faculty work for "plagiarism";

8

"immediately shutter all diversity, equity, and inclusion (DEI) programs"; end support for certain student organizations; adjust discipline procedures; and cooperate with audits by the Administration—all "to the satisfaction of the federal government." JA393-97. The letter concluded: "We expect your immediate cooperation in implementing these critical reforms that will enable Harvard to return to its original mission of innovative research and academic excellence." JA397.

On April 14, Harvard said no to the government's demands. JA398. Its response stated that the government's April 11 letter "present[ed] demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court." JA398-99.

### 3.　*The April 14 Freeze Order*

Hours after Harvard's response, the Task Force announced a "freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University." JA412. The government's press release complained that "Harvard's statement today reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges—that federal investment does not come with the responsibility to uphold civil rights laws." *Id.* The freeze

order did not purport to follow the procedures required under Title VI prior to a funding termination, such as a hearing or notification to Congress. *See* 42 U.S.C. § 2000d-1.

Following the April 14 freeze order, "the government immediately began sending out stop work orders on certain grants, which required the cessation of all activities related to those projects, seemingly without regard to the consequences for the projects or the affected employees." A11. At least one agency instructed its officials "that we should not provide any communications to these schools about whether or why the funds are frozen." A12.

Around this time, the President also began directing invective against Harvard for the ideologies found on its campus. On April 15, the President posted that "[p]erhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?'" JA336. The next day, the President posted that "Harvard has 'lost its way,'" in part because it "has been hiring almost all woke, Radical Left, idiots, and 'bird-brains,'" such that "Leftist dopes[] are teaching at Harvard." JA336-37; *see also* JA337 ("Harvard is a JOKE, teaches Hate and Stupidity, and

should no longer receive Federal Funds."). On April 24, the President again expressed that Harvard "is a Liberal mess" and a "threat to Democracy." JA337. On May 2, he said that the Administration would "be taking away Harvard's Tax Exempt Status" because "[i]t's what they deserve!" *Id.*

### 4. *The May 5 Freeze Order and Subsequent Termination Letters*

On May 5, Secretary of Education Linda McMahon sent a communication to Harvard that largely parroted the President's attacks. The letter criticized Harvard for allegedly failing "to abide by its legal obligations" and for lacking "any semblance of academic rigor." JA400. It denounced Harvard for hiring faculty members the Trump Administration disfavors, like "failed mayors Bill [d]e Blasio and Lori Lightfoot"; developing alternative grading systems and "scrapp[ing]" standardized tests; "teach[ing] [Harvard's] students to despise" a "free-market system"; and "encourag[ing] resentment and instill[ing] grievance and racism into our wonderful young Americans." JA400-01. The letter stated that it "mark[ed] the end of new grants for the University." JA402.

11

Two days later, Secretary McMahon gave an interview about the defunding of Harvard. She commented that the Administration sought to combat "antisemitism that [Harvard] did not address," but that the Administration "also wanted to make sure" that Harvard was "vetting professors that they're hiring to make sure that they're not teaching ideologies but that they're teaching subject matter[.]" JA337-38.

Between May 6 and May 12, a panoply of federal agencies sent letters terminating Harvard's grants, ultimately ending roughly $2.7 billion of awards. *See* JA775-806. "The terminated grants related to all manner of medical, scientific, technological, and other projects— including projects on breast cancer detection and prevention, biological threats, overcoming antibiotic resistance, improving neurologic outcomes for pediatric cancer survivors, developing drugs to treat long-term radiation exposure and for chemotherapy, studying the effects of particulate matter exposure on military veterans, and creating technologies that provide energy-relevant minerals for economic and national security." A16 (internal quotation marks omitted). Most of the termination letters stated that the grant awards "no longer effectuate agency priorities," adverting to "recent events at Harvard University

12

involving antisemitic action." A17 (citations omitted). But "[n]one of the Termination Letters identified any specific instance of antisemitism on Harvard's campus, specified how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI, or reflected any effort to follow the Title VI procedural requirements that govern the termination of federal funding." *Id.*

## B. The Funding Termination's Devastating Effects on Plaintiffs

The plaintiffs in this suit are the American Association of University Professors (AAUP); AAUP's Harvard faculty chapter; and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW). JA38. AAUP is a membership organization of faculty and academic professionals whose mission is to advance academic freedom and shared governance of higher education institutions. JA45, JA339. UAW's members include graduate students, postdoctoral scholars, researchers, university staff, and faculty, including at Harvard. JA342.

The Administration's efforts to terminate Harvard's funding severely threatened plaintiffs' members' research, livelihoods, and professional relationships. For plaintiffs' members, federal funding

13

covers their salaries as well as employees' salaries, the cost of research equipment and space, and critical project activities. JA168, JA184, JA204, JA224, JA232. The individual researchers—"who are responsible for funding their own research"—"apply for federal grants, are awarded the grants on the strength of their credentials and proposed research, and then build their professional reputations on those grants." A36. "[I]t is their names that appear directly on the face of the grant agreements, their labs that receive the funding, and their research that is eliminated when funding is discontinued." *Id.* As the district court explained, these "members are at least as connected to the grants and funding at issue here as is Harvard." A37.

The government's grant terminations forced many AAUP and UAW members to cease their research activities. For example, AAUP member Molly Forrest Franke was required to end her partnerships with public-health providers after the Administration terminated her grants related to HIV and tuberculosis. JA347-49. AAUP member John Quackenbush faced the risk that his cancer research "will effectively be dead," JA356, while AAUP member Sarah Fortune was forced to lay off researchers studying tuberculosis, JA361. AAUP member Don Ingber received an

14

order instructing him to cease work on projects studying the biological effects of radiation. JA362-64. And UAW member Adam Sychla has had to deprioritize research about next-generation gene therapies, JA378-79, while UAW member Kelsey Tyssowski could have been forced to leave academic science had her research grant been terminated, JA380-81.

The plaintiffs' members have suffered harms beyond the loss of funding. Harvard implemented a hiring freeze in response to the uncertainty caused by the government's actions. JA345. That freeze impairs members' ability to maintain employment at Harvard and limits their ability to hire research assistants. *Id.* Harvard also implemented other policies—including removing the two faculty directors of the Center for Middle Eastern studies and supplanting faculty jurisdiction over student disciplinary procedures—that plaintiffs' members understand to have been related to the government's targeting of the university. JA143, JA346. The chilling effect from the government's actions caused some AAUP and UAW members "to self-censor their language both inside and outside the classroom" out of fear of further reprisal. JA347.

15

### C.    Plaintiffs' Suit and Proceedings Below

Plaintiffs filed this suit on April 11, 2025—the same day as the government's proposed "agreement in principle," three days before the April 14 freeze order, and ten days before Harvard initiated litigation. *See* A2, A8, A11.  Plaintiffs then filed two amended complaints.  *See* A21. Among other claims, plaintiffs asserted that the government's freeze orders and termination decisions violated the First Amendment, failed to follow Title VI's procedures, and were arbitrary and capricious in violation of the Administrative Procedure Act (APA).  JA119-28.

After consolidating plaintiffs' case with Harvard's for oral argument and decision, the district court granted in part and denied in part plaintiffs' motion for summary judgment.  A1-84.  The court granted judgment to plaintiffs on the First Amendment, Title VI, and arbitrary-and-capricious claims against the freeze orders and on the First Amendment and Title VI claims against the termination letters.  As to the threshold issues, the court held that plaintiffs had standing because their members "experience[d] concrete harm by virtue of the grant terminations," A38; that plaintiffs challenged final agency action, A45; and that it had jurisdiction over the claims discussed here (but not

16

certain other claims), A31.  On the merits, the court found that "a review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment[,] and Title VI."  A79.

The district court entered a permanent injunction and final judgment.  *See* SA1-4.[1]  The court declared unlawful and set aside both the termination letters and the freeze orders.  SA1-3.  It permanently enjoined defendants from "[i]mplementing, instituting, maintaining, or giving any force or effect" to the freeze orders and termination letters, as well as from "[i]ssuing any other termination, fund freezes, stop work orders, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights or the rights of its faculty and staff, for the purpose of

---

[1] Because the government appended Harvard's final judgment, plaintiffs include the correct judgment in a supplemental addendum.

17

suppressing disfavored speech, or on any purported grounds of discrimination without compliance with the terms of Title VI." SA2-4.

The government appealed. JA386. Its appeal does not challenge the district court's decision regarding the freeze orders. U.S. Br. 18 n.6. Rather, it limits its arguments to the portion of the judgment concerning the grant terminations.

## SUMMARY OF THE ARGUMENT

When Harvard refused to surrender its academic governance to federal control, the government stripped it of $2.7 billion in grants—grants that supported critical research concerning cancer, biodefense, and other work essential to Americans' health and national security—without any of the procedural protections Congress enacted to govern such defunding decisions. The district court properly granted relief to right that wrong. It correctly exercised jurisdiction over plaintiffs' First Amendment and Title VI challenges to the government's termination decisions. And on the merits, the court correctly ruled that the government's actions were retaliatory in violation of the First Amendment—and, alternatively, that they exceeded the government's statutory authority under Title VI.

18

**I.** Neither of plaintiffs' claims is the type that Congress has routed to the Court of Federal Claims. The First Amendment claim falls outside the claims court's jurisdiction because it does not turn on the existence or terms of a contract. And Congress has specifically conferred district-court jurisdiction over claims contesting funding terminations under Title VI. Plaintiffs' claims also belong in district court for a second reason: Plaintiffs are not party to the relevant contracts, meaning the Tucker Act (which requires privity between a plaintiff and the government) does not apply and cannot displace district-court jurisdiction.

**II.** The funding terminations violated the First Amendment, which prohibits the government from using its powers to alter a speaker's protected expression—particularly when academic freedom is at play. Here, the government stated that it stripped Harvard of federal funds because of the government's desire to change who teaches and what is taught at Harvard. The government's attempt to backtrack on its improper motives defies the record, which leaves no doubt that the government's desire to punish Harvard for the speech on its campus was a but-for cause of the government's action.

**III.** Even if the record supported the government's alternative version of its actions, that would mean the government terminated Harvard's federal funds without providing the detailed procedures and protections required by Title VI, which governs efforts to strip federal funds based on accusations of discrimination. The government cannot escape liability based on its late-breaking reliance on a regulation that does not—and cannot—override Title VI's statutory mandates.

## ARGUMENT

### I.    THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER THE TERMINATION LETTERS.

The government devotes the majority of its argument to the claim that the district court lacked jurisdiction over plaintiffs' challenge to the termination letters. U.S. Br. 24-39. It insists that because "[t]he essence of Harvard's [sic] complaint is that the Government should not have cancelled their grant agreements," this case belongs in the Court of Federal Claims pursuant to "the Tucker Act's jurisdictional scheme." *Id.* at 24. But no appellate court has ever held that the Tucker Act channels

a First Amendment or Title VI claim to the Court of Federal Claims—and this Court should not be the first.[2]

The Tucker Act grants jurisdiction over actions against the government based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Courts have understood that jurisdiction to be exclusive for contract claims over $10,000. *See Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988). District courts therefore lack authority to hear contract claims against the government. They equally lack jurisdiction to hear "'disguised' contract claims"—that is, any claim that is "'at its essence' a contract action." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968-69 (D.C. Cir. 1982).

Whether a claim is a contract claim subject to the Tucker Act turns on two factors. The first is "the source of the rights upon which the plaintiff bases its claims." *Megapulse*, 672 F.2d at 968. The second is "the type of relief sought (or appropriate)." *Id.* As the Supreme Court recently explained, the Tucker Act confers jurisdiction in the Court of

---

[2] The government does not challenge the district court's jurisdiction over the freeze orders. U.S. Br. 25 n.9. Likewise, plaintiffs do not challenge the district court's conclusion that it lacked jurisdiction over the arbitrary-and-capricious challenge to the termination letters. *See* A27, A31.

Federal Claims over orders that "enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (citation omitted). But "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910).

For two independent reasons, the district court correctly exercised jurisdiction over this suit. *First*, neither of plaintiffs' claims is the sort that Congress has routed to the Court of Federal Claims. Plaintiffs' First Amendment claim does not turn on the existence of a contract and does not seek to enforce a contractual obligation. And plaintiffs' Title VI claim depends on a statute that Congress specifically drafted to confer district-court jurisdiction over funding-termination claims. *Second*, plaintiffs are not parties to Harvard's contracts, meaning the Tucker Act cannot displace district-court jurisdiction because plaintiffs' suit is not "based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

22

### A.    Plaintiffs' First Amendment and Title VI claims fall outside of the Tucker Act's scope.

The district court correctly exercised jurisdiction over plaintiffs' First Amendment claim, which involves "a bedrock constitutional principle rather than the interpretation of contract terms." A31.  And the same is true of plaintiffs' claim under Title VI, a statute that "itself expressly authorizes 'judicial review' of agency action 'terminating or refusing to grant or to continue financial assistance.'"  A28-29 (quoting 42 U.S.C. § 2000d-2).

#### 1.    *First Amendment claims do not depend on the existence of a contract.*

The Tucker Act does not require First Amendment claims to be litigated in the Court of Federal Claims.  None of the Tucker Act decisions cited by the government has held as much—indeed, in recent litigation, the government affirmatively told the Ninth Circuit that it was not arguing that the Tucker Act precluded district-court jurisdiction over a First Amendment claim.[3]  For good reason: Both the source of rights and

---

[3] July 31, 2025, Oral Argument at 27:20, *Thakur v. Trump*, No. 25-4249 (9th Cir.) ("[W]e have not argued in this motion that the First Amendment claims are subject to the [Tucker Act] channeling."); Nov. 14, 2025, Oral Argument at 17:22, *Thakur v. Trump*, No. 25-4249 (9th Cir.)

23

the nature of the relief requested confirm that plaintiffs' First Amendment claim is not a contractual claim for damages. *Megapulse,* 672 F.2d at 968.

To start, plaintiffs' claim is based on the constitutional right to be free from viewpoint discrimination and retaliation—not on any entitlement to any money. The Supreme Court has squarely held that whether plaintiffs have a "contractual … 'right'" is "immaterial to [their] free speech claim." *Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972). Thus, a government's nonrenewal of a contract on retaliatory or coercive grounds violates the First Amendment even if the plaintiff lacks a "contractual … claim" in the first instance, as the source of the right is the First Amendment and not the contract. *Id.* at 597. Or, put differently, "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (citation omitted); *see Barton v. Clancy*, 632 F.3d 9, 26 (1st Cir. 2011) (similar). Thus, even

---

(acknowledging that the government "didn't press the Tucker Act argument on the First Amendment claims").

24

where the government is entitled to terminate a contract (or to decline to enter one) "without any reason at all," it may not do so "in retaliation" against a plaintiff's "exercise of constitutionally protected speech." *Barton*, 632 F.3d at 26 (quoting *Ward v. Hickey*, 996 F.2d 448, 452 (1st Cir. 1993)).

Plaintiffs' First Amendment claim therefore falls outside of the Tucker Act because it does not seek "to enforce a contractual obligation." *California*, 604 U.S. at 651 (citation omitted); *see Khalil v. Trustees of Columbia Univ. in City of N.Y.*, 2026 WL 775813, at \*10 (S.D.N.Y. Mar. 19, 2026) (explaining that the "*basis* of plaintiffs' claims" comes from an "'independent, non-contractual source'—the First Amendment" (citation omitted)).  Nor is the First Amendment claim "'based on' the research-related grants" here, *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2658 (2025), because in asserting a First Amendment violation, plaintiffs are "not relying on the contract at all," *Megapulse*, 672 F.2d at 969.  A claim that can succeed even if no contract or entitlement exists at all cannot be a disguised contractual claim.  And because First Amendment claims are not "money-mandating," the "Federal Circuit has expressly held the Court of Federal Claims lacks jurisdiction over claims arising under the

25

First Amendment." *Stephens v. United States*, 165 Fed. Cl. 341, 348 (Fed. Cl. 2023).

In addition, the relief plaintiffs seek is incompatible with jurisdiction in the Court of Federal Claims, which can order only payment of past due sums. "[W]hen a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." *Mahmoud v. Taylor*, 606 U.S. 522, 559-60 (2025). As the Supreme Court reiterated this year, an unconstitutional government demand can cause injury "when it is made and for as long as it remains outstanding," even if it has not yet caused a "tangible harm" like "monetary loss," *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1125 (2026); *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation omitted)).

But relief in the Court of Federal Claims is "limited to actual, presently due money damages from the United States." *Todd v. United States*, 386 F.3d 1091, 1093-94 (Fed. Cir. 2004) (citation omitted). The claims court generally cannot order preliminary injunctive relief, *see*

*Sergent's Mech. Sys., Inc. v. United States*, 157 Fed. Cl. 41, 48 (Fed. Cl. 2021), nor can it "consider a claim for money damages that is anticipatory, rather than for presently due money damages," *Swain Cnty. v. United States*, 2017 WL 1488808, at \*4 (Fed. Cl. Apr. 26, 2017). In other words, the Court of Federal Claims cannot redress the "'here-and-now' injury" caused by defendants' unconstitutional acts. *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 192 (2023).

This case proves the point. Plaintiffs sued on April 11, 2025, *before* any grants to Harvard were terminated. *See* A4. And plaintiffs explained that defendants' actions "chill[ed] the expression" of "viewpoints on campus," forced their members to "engag[e] in self-censorship on topics that are in tension with Defendants' espoused viewpoint," and caused them to "avoid topics explicitly disfavored by the Trump administration." JA110, JA115, JA118. None of those injuries is monetary or subject to redress by later action in the Court of Federal Claims. Forcing plaintiffs' free-speech claims into a court with such limited jurisdiction would contradict the "special solicitude" courts have long given "First Amendment claims." *N.Y. Rep. State Comm. v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015).

27

The government fails to reckon with the unique nature of a First Amendment claim, instead relying on cases that involved claims based on violations of contractual rights and that did not address free-speech issues. *See* U.S. Br. 26-33. In *California*, the sole claim on review was that the government's "boilerplate letters" terminating grants were arbitrary and capricious due to their "lack of proper explanation." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 95, 98 (1st Cir. 2025). And in *NIH*, the Court reviewed a pair of "district court[] judgments" that "address[ed] only the arbitrary and capricious nature of the agencies' policies" on certain funding terminations. *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 52 n.5 (1st Cir. 2025); *see id.* at 54. While the plaintiffs brought other claims, *see* U.S. Br. 28, the lower courts granted—and the Supreme Court stayed—relief based *only* on arbitrary-and-capricious claims. *NIH*, 145 S. Ct. at 2660.[4]

Those decisions reflect the view that arbitrary-and-capricious claims challenging contract terminations may not be "truly independent

---

[4] *See* Rule 54(b) Partial Final Judgment at 3, No. 25-cv-10787 (D. Mass. June 23, 2025), Dkt. 138 (declaring grant terminations "unlawful, arbitrary and capricious final agency actions under 5 U.S.C. § 706(2)(A)"); Rule 54(b) Partial Final Judgment at 2, No. 25-cv-10814 (D. Mass. June 23, 2025), Dkt. 151 (similar).

of the contracts." *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 823 (D.C. Cir.), *reh'g en banc granted and vacated*, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) (internal quotation marks and citation omitted). In contrast with arbitrary-and-capricious claims challenging agency guidance, *see NIH*, 145 S. Ct. at 2661, such claims can sometimes "be evaluated only by reference to and incorporation of the agreements," or may "turn[], in substance, on principles of federal contract law" about whether the government "dishonor[ed], with impunity, its contractual obligations," *Climate United Fund*, 154 F.4th at 823 (internal quotation marks and citations omitted). Thus, the Court of Federal Claims can assess whether the government's termination of a contract was an "abuse of discretion" that was "arbitrary and capricious." *JKB Sols. & Servs., LLC v. United States*, 170 Fed. Cl. 241, 256 (Fed. Cl. 2024) (citation omitted). By contrast, plaintiffs' First Amendment claim does not turn on whether the government properly terminated the contract pursuant to contract-law principles because that claim is not premised on the existence of a contract.

The government invokes *New York v. Trump*, 171 F.4th 1 (1st Cir. 2026), but that case likewise does not resolve the First Amendment

29

question. There, a set of States brought claims under the APA and the Constitution's separation-of-powers provisions—but not the First Amendment. *See New York v. Trump*, 769 F. Supp. 3d 119, 130, 134 (D.R.I. 2025). The district court granted relief based only on plaintiffs' APA claims. *See id.* at 142. This Court largely affirmed the preliminary injunction on the basis that the government's "actions were arbitrary and capricious," *New York*, 171 F.4th at 20, while vacating one provision of the injunction that "ordered specific performance with respect to payment to remedy the States' contractual injuries," *id.* at 27. Thus, while the States had asserted claims both under "the APA and other various constitutional guarantees," the relief the Court vacated was premised on an arbitrary-and-capricious claim alone and focused on remedying a contractual injury. *See id.* at 20-24, 27-28. The Court had no occasion to conduct the Tucker Act analysis for a First Amendment claim that does not even turn on the *existence* of a grant or contract.

The Fourth Circuit similarly has not directed a First Amendment claim to the Court of Federal Claims. *See* U.S. Br. 30-32. In *Sustainability Institute v. Trump*, 165 F.4th 817 (4th Cir. 2026), the district court did not grant relief on plaintiffs' First Amendment claim,

ruling instead on their separation-of-powers, contrary-to-law, and arbitrary-and-capricious claims. *See id.* at 822-24. Those claims asserted that the government was obligated to fund the terminated grants. *See Sustainability Inst. v. Trump*, 784 F. Supp. 3d 861, 875 (D.S.C. 2025). So too with *Solutions in Hometown Connections v. Noem*, 165 F.4th 835 (4th Cir. 2026). Although the plaintiffs asserted a First Amendment claim, their motion for a preliminary injunction was not premised on that claim, nor did the district court address it. *See Solutions in Hometown Connections v. Noem*, 2025 WL 1530318, at *10-14 (D. Md. May 29, 2025). Again, the relevant claims were premised on a "right to funding under their respective grants"—an argument that derives from the contract itself, unlike the First Amendment claim here. *Solutions*, 165 F.4th at 839-40.

The government's brief barely grapples with the nature of the claims in its cited cases, instead asserting that virtually any claim related to funding must go to the Court of Federal Claims. That position ignores the claim-specific analysis that the *Megapulse* framework requires, as well as the Supreme Court's directive that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside

31

an agency's action may result in the disbursement of funds." *California*, 604 U.S. at 651 (quoting *Bowen*, 487 U.S. at 910). And it ignores that regardless of whether "Harvard … [has] a First Amendment entitlement to taxpayer money," U.S. Br. 33, the First Amendment prohibits the government from using its discretion to retaliate against or punish speech—including by terminating a contract.

## 2. Congress independently conferred district-court jurisdiction over Title VI funding-termination claims.

Plaintiffs' Title VI claim likewise does not "fall within the ambit of the Tucker Act." A28. Congress expressly directed challenges related to funding terminations under Title VI to district court and not the Court of Federal Claims.

The statute's text is dispositive. The statute prohibits discrimination "on the ground of race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. And its judicial-review provision states:

> Any department or agency action taken pursuant to section 2000d-1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to

32

comply with any requirement imposed pursuant to section 2000d-1 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that chapter.

*Id.* § 2000d-2. In the second sentence of that provision, Congress expressly contemplated that actions challenging "terminati[ons] or refus[als] to grant or to continue financial assistance" would be brought under the APA.

Thus, as numerous courts have explained, Congress chose in Title VI to specify that "[j]udicial review of any funding termination is available in an Article III court." *Colwell v. HHS*, 558 F.3d 1112, 1128 (9th Cir. 2009); *see Schlafly v. Volpe*, 495 F.2d 273, 282 (7th Cir. 1974) (the "clear intent of section 2000d-2 is to provide a forum for judicial review," and "[i]t incorporates the provisions of the APA"); *see also Adams v. Bell*, 711 F.2d 161, 189 (D.C. Cir. 1983) (Wright, J., dissenting) ("the traditional mode" for review under 42 U.S.C. § 2000d-2 is "the APA"). Given that directive, "[m]ultiple courts have held that the Tucker Act is not relevant where a challenge to a funding decision is brought under Title VI." *Chicago Transit Auth. v. U.S. Dep't of Transp.*, 824 F. Supp. 3d 677, 682 (N.D. Ill. 2026) (internal quotation marks and citation omitted)

33

(citing cases). And courts interpreting Title IX's judicial-review provision, which contains the same key language, *see* 20 U.S.C. § 1683, have also explained that it provides for APA review of funding terminations. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 604 (6th Cir. 2024).

The government's contrary arguments cannot be squared with the statutory text or with judicial consensus. The government begins with generalities, asserting that "a plaintiff cannot evade the Tucker Act simply by alleging that a contractual action violates some statute." U.S. Br. 33. But the claim here does not allege the violation of any statute— it alleges the violation of Title VI. And Congress decided to assign jurisdiction over Title VI funding-termination claims to district courts. The lead cases that the government cites—about the Debt Collection Act and "federal acquisition regulations"—have nothing to do with Title VI. U.S. Br. 33-34; *see Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985). Even if a challenge to a funding termination could be framed as a contract claim, Section 2000d-2 specifically confers district-court jurisdiction over such challenges.

34

The one Title VI authority the government identifies also fails to support its position. In *Bakersfield City School District of Kern County v. Boyer,* 610 F.2d 621 (9th Cir. 1979), the Ninth Circuit explained that, in general, a person aggrieved by a Title VI defunding may "obtain judicial review … under the Administrative Procedure Act." *Id.* at 624. The court reached a different conclusion only because of the unique circumstances of the plaintiff's challenge, which involved the deferral of "specific funds" that "ha[d] long since been disbursed to other applicants or ha[d] reverted back to the Treasury" and were "no longer available for payment to the [plaintiff] as they were when the [administrative] proceedings began"—proceedings that provided remedies the plaintiff had failed to exhaust. *Id.* at 626, 628. That narrow, fact-specific holding has no application here given plaintiffs' timely suit and the district court's intervention.

Finally, the government limits its engagement with the text of Title VI to a footnote. U.S. Br. 35 n.10. That footnote starts with a merits argument (refuted below) that the government's grant terminations were "not pursuant to Title VI." *Id.* It then insists that the phrase "not otherwise subject to judicial review" means that the Tucker Act

35

supplants Title VI's reference to the APA. *Id.* (citation omitted). The government cites no authority for that proposition, and precedent rejects it: Courts have understood Title VI's reference to other avenues of judicial review to refer to more specific judicial-review statutes that govern narrow statutory contexts. *See, e.g., Freeman v. Cavazos*, 923 F.2d 1434, 1440 (11th Cir. 1991) (per curiam) (20 U.S.C. § 1234g); *Gardner v. Alabama*, 385 F.2d 804, 810 (5th Cir. 1967) (42 U.S.C. § 1316(a)(3)); *see also Tennessee*, 104 F.4th at 604 n.23 (suggesting the "not otherwise subject to judicial review" language in Title IX's equivalent provision might "be a poorly drafted savings clause").

That precedent makes sense: Section 2000d-2's reference to other avenues of judicial review is an acknowledgment that more specific judicial-review schemes should displace the otherwise-applicable default of APA review—not an oblique direction to route all funding-related claims to the Court of Federal Claims. In fact, the government's reading would render Section 2000d-2's reference to the APA largely superfluous. Under its view, virtually every decision "terminating … financial assistance" under Title VI would be a contract dispute that must go to the Court of Federal Claims. But the statute itself contemplates that, as

36

a general matter, those claims will be reviewed "in accordance with" the APA. 42 U.S.C. § 2000d-2. The government's position would subvert that congressional choice entirely.

## B. Because plaintiffs are not parties to Harvard's contracts, the Tucker Act does not govern their suit.

Plaintiffs' claims belong in district court for a second reason: They are not parties to the relevant grants. Because they could not bring their First Amendment and Title VI claims in the Court of Federal Claims—which requires privity of contract—the Tucker Act does not displace district-court jurisdiction here.

"There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Secretary of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006); *see id.* at 176 ("We categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims."). In other words, if a "plaintiff could not bring" an action "in Claims Court in the first place, that Court would not have exclusive jurisdiction of them." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1109 (D.C. Cir. 2022).

37

Here, plaintiffs cannot bring their claims under the Tucker Act because they do not have a contract with the government. "[T]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998); *see Chancellor Manor v. United States*, 331 F.3d 891, 899 (Fed. Cir. 2003) (requiring "privity of contract" for a suit under the Tucker Act). But plaintiffs are not party to the relevant contracts because the grants "are awarded, in name, to the 'President and Fellows of Harvard College.'" A36. To be sure, as the district court found—and as the government does not even contest—plaintiffs have a significant enough stake in the contracts to have Article III standing. Their members were forced to cease (or were about to cease) research because of defendants' actions, and it is "their names that appear directly on the face of the grant agreements, their labs that receive the funding, and their research that is eliminated when funding is discontinued." *Id.* But plaintiffs' undeniable interest in the contracts does not convert them into parties to those contracts—and they thus lack the privity required to sue in contract under the Tucker Act.

38

District courts have therefore exercised jurisdiction over challenges brought by students and faculty who are "not signatories to the underlying contracts" because that lack of privity means they "could not themselves bring claims in the Court of Federal Claims." *Khalil*, 2026 WL 775813, at \*11 (quoting *New Jersey v. U.S. Dep't of Transp.*, 2026 WL 323341, at \*4 (S.D.N.Y. Feb. 6, 2026)); *see AAUP v. Trump*, 815 F. Supp. 3d 907, 957 (N.D. Cal. 2025), *appeal dismissed,* 2026 WL 1049175 (9th Cir. Feb. 11, 2026).  Put differently, the Tucker Act does not displace district-court jurisdiction where "Plaintiffs have no contractual relationship with the Government." *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 155 F.4th 1099, 1106 (9th Cir. 2025) (order denying rehearing en banc); *see Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 938-39 (9th Cir. 2025).[5]  And more broadly, courts routinely consider the lack of privity as a factor favoring district-court jurisdiction.  *See, e.g.*, *Metro.*

---

[5] The Ninth Circuit recently held that the Tucker Act divested jurisdiction over certain arbitrary-and-capricious claims brought by non-privity plaintiffs. *Thakur v. Trump*, 176 F.4th 1187, 1197 (9th Cir. 2026) (per curiam).  But *Thakur* reaffirmed that the analysis differs when a plaintiff seeks to enforce a "*statutory* obligation" as opposed to an APA obligation that is fundamentally a "*contract* claim." *Id.* at 1199 & n.4.  Proving the point, *Thakur* went on to affirm the district court's preliminary injunction based on the plaintiffs' First Amendment claims. *See id.* at 1199.

*Transp. Auth. v. Duffy*, 2026 WL 588117, at \*32-33 (S.D.N.Y. Mar. 3, 2026); *Washington v. U.S. Dep't of Educ.*, 2025 WL 2966255, at \*9 (W.D. Wash. Oct. 21, 2025).

The government's position would result in the untenable outcome that plaintiffs could not bring their claims anywhere—in district court or the Court of Federal Claims. And it is a "well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed." *Califano v. Sanders*, 430 U.S. 99, 109 (1977); *see Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986) (describing the "strong presumption that Congress intends judicial review of administrative action"). Similarly, Title VI makes clear that district-court jurisdiction is available whenever an action is not "otherwise subject to judicial review." 42 U.S.C. § 2000d-2. Because plaintiffs' constitutional and statutory claims cannot be heard in the Court of Federal Claims, it follows from the "strong presumption" in favor of judicial review that they may proceed in district court. *Bowen*, 476 U.S. at 670; *see* 5 U.S.C. § 704 (permitting review of agency action "for which there is no other adequate remedy in a court").

40

## II.     THE FUNDING TERMINATION VIOLATES THE FIRST AMENDMENT.

On the merits, the funding termination violates the First Amendment, which prohibits the use of state authority to coerce changes to the academic life of a university. By demanding that Harvard alter the expression on its campus—and then defunding Harvard when it refused—the government transgressed that bedrock rule. Because the record makes plain that the government targeted Harvard because of the speech expressed on campus, the district court properly granted summary judgment on plaintiffs' First Amendment claim.

### A.     The government may not coerce a university to alter expression on its campus.

"The framers designed the Free Speech Clause of the First Amendment to protect the freedom to think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (internal quotation marks and citation omitted). An "obvious implication of that rule is that the government usually may not impose prior restraints on speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). "[O]ther implications follow too," including that "the First Amendment prohibits government officials from subjecting individuals to retaliatory

41

actions after the fact for having engaged in protected speech." *Id.* (internal quotation marks and citation omitted).

Additionally, under the First Amendment, "a government official cannot do indirectly what she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Thus, as explained earlier, "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit." *Rumsfeld*, 547 U.S. at 59 (citation omitted). Nor may the government "coerce a private party to punish or suppress disfavored speech on [the government's] behalf." *Vullo*, 602 U.S. at 190; *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

A "special concern" of the First Amendment is "academic freedom." *Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 12-13 (1st Cir. 2025) (alteration and citation omitted). The Supreme Court "has long upheld the essentiality of freedom in the community of American universities," *id.* at 12 (citation omitted), recognizing that "[t]eachers and students must always remain free to inquire" and "to study and to evaluate," *Keyishian*, 385 U.S. at 603 (quoting *Sweezy*, 354 U.S. at 250). "It matters little whether" the government's attempt to

intervene on campuses "occurs avowedly or through action that inevitably tends to check the ardor and fearlessness of scholars." *Sweezy*, 354 U.S. at 262 (Frankfurter, J., concurring in the result). Whatever its methods, the government cannot "correct the mix of speech" within a university. *Moody v. NetChoice LLC*, 603 U.S. 707, 740 (2025).

The government thus gets it backwards in briefly suggesting that this case merits lesser First Amendment scrutiny because "the Government was acting in its capacity as a contractor" with Harvard. U.S. Br. 46; *see Bd. of Cnty. Comm'rs v. Umbehr,* 518 U.S. 668, 676 (1996). "[G]iven that the First Amendment right to and protection of academic freedom is squarely in play," concerns about speech suppression are at their height here. A47. Thus, the district court correctly rejected the view that "a private research university becomes a government 'contractor' for First Amendment purposes by accepting the government's invitation to apply for and thus collaborate on federal research grants." *Id.*; *see Pernell v. Fla. Bd. of Governors of State Univ.*, 2026 WL 1955783, at *7 (11th Cir. July 7, 2026) ("[T]he rationale underlying the *Pickering-Connick-Garcetti* trio of cases does not apply with equal force to curricular speech by university professors."). The government identifies

43

no "binding authority"—or any authority at all—applying relaxed First Amendment scrutiny in academic contexts simply because federal grants are involved.  A47.

## B. The government terminated Harvard's grants in an effort to alter expression on Harvard's campus.

The district court correctly granted summary judgment on plaintiffs' "claims for retaliation, unconstitutional conditions, and unconstitutional coercion." A60.  To establish retaliation, a plaintiff must show that the government "subject[ed]" him "to retaliatory actions for engaging in protected speech," and that there is a "causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks and citation omitted).  The standards for unconstitutional conditions and coercion similarly ask if the government took adverse action in response to protected activity.  *See Perry*, 408 U.S. at 597 (the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests"); *Vullo*, 602 U.S. at 191 (the government cannot "convey a threat of adverse … action in order to punish or suppress the plaintiff's speech").

44

The government does not contest most of the elements of these First Amendment claims. The government does not challenge the district court's holding that Harvard and its faculty and researchers engage in "constitutionally protected conduct." U.S. Br. 46 (citation omitted). Nor could it. As already explained, the research and teaching performed by Harvard's faculty and graduate students sit in the First Amendment's heartland. *See* A48-49. And the government does not question (nor could it) that it took "adverse action" against Harvard sufficient to chill that protected expression. U.S. Br. 46 (citation omitted).

As the government admits, then, this case comes down to "causation." U.S. Br. 47. The relevant First Amendment doctrines all ask a common question: Did the government act "in order to punish or suppress … protected expression"? *Vullo*, 602 U.S. at 196; *see Perry*, 408 U.S. at 597. The test is "but-for" causation, "meaning that the adverse action against the plaintiff would not have been taken absent" the motivation to suppress protected expression. *Nieves*, 587 U.S. at 399. If a plaintiff can show that protected conduct was at least "a substantial or motivating factor" of the government action, the burden shifts to the government to "show[] that the [action] would have been initiated

45

without respect" to protected speech. *Lozman v. Riviera Beach*, 585 U.S. 87, 97 (2018). Thus, the test is whether the government would have taken the same action absent its target's protected expression.

### 1. *The government's communications focus on Harvard's protected expression.*

The government cannot carry that burden here. The record, as thoroughly examined by the district court, makes apparent that the government's defunding "would not have been taken" absent the government's disagreement with the speech on Harvard's campus. *Nieves*, 587 U.S. at 399. The government repeatedly threatened to strip Harvard's funding unless Harvard agreed to alter its own speech and to coerce its faculty into doing the same. And when Harvard refused to accept that intrusion on academic freedom, the government followed through on its threat. Its letter terminating Harvard's funds—as well as the contemporaneous statements of the Executive Branch's most senior officials—confirms that the government objected to the viewpoints taught at and held by Harvard. These before-and-after statements "make[] no bones about why [the government] chose its target": It defunded Harvard because Harvard would not accede to its unconstitutional demands. *Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 88 (D.D.C. 2025).

46

The most glaring evidence lies in the government's April 3 and April 11 demands to Harvard. The April 3 letter set the tone by accusing Harvard's academic programs of "bias" and by demanding that Harvard cease instruction that supposedly "fuels division and hatred." JA391-92. Then came the April 11 letter, which—as the district court noted—was an unusually blatant attempt to require Harvard "to hire faculty and make curricula and research choices that better aligned with the government's preferred viewpoints." A60. The letter began by accusing Harvard of "ideological capture," charging that the university has "failed to live up to" the "intellectual … conditions" that "justify federal investment." JA393. And it "present[ed] the below provisions as the basis for an agreement in principle that will maintain Harvard's financial relationship with the federal government," *id.*, including:

- **Disempowering certain faculty and students.** The letter demanded that Harvard "reduc[e] the power held by students and untenured faculty" and "reduc[e] the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship." JA393-94.

- **Changing admissions and faculty-hiring practices to prioritize "viewpoint diversity."** The letter demanded changes to Harvard's faculty-hiring and admissions practices. In particular, the letter decreed that Harvard should "commission an external party … to audit the student body, faculty, staff, and leadership for viewpoint diversity." JA394. It continued: "Every department or

47

field found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty within that department or field who will provide viewpoint diversity; every teaching unit found to lack viewpoint diversity must be reformed by admitting a critical mass of students who will provide viewpoint diversity." JA395.

- **Overhauling academic programs.** The letter required Harvard to "commission an external party" that "satisf[ies] the federal government as to its competence and good faith" to "audit those programs and departments" that "reflect ideological capture." JA395. The letter listed specified programs, including "the Divinity School, Graduate School of Education, School of Public Health, Medical School … and the Harvard Law School International Human Rights Clinic." *Id.*

The letter concluded: "We expect your immediate cooperation in implementing these critical reforms that will enable Harvard to return to its original mission of innovative research and academic excellence." JA397.

After Harvard rebuffed the April 11 letter by stating that it would not permit the government to "invade university freedoms long recognized by the Supreme Court," JA398-99, the government stripped Harvard's funds. And the government's next letter—the May 5 missive—makes clear that the Executive Branch did so because of who teaches and what is taught on Harvard's campus. Charging that "Harvard has made a mockery of this country's higher education system," the government's objections included: Harvard's alleged lack of "any semblance of academic

48

rigor"; its decision to offer "remedial math"; its choice to "hire[] failed Mayors Bill [d]e Blasio and Lori Lightfoot"; the role of "strongly left-leaning political appointee Penny Pritzker, a Democrat operative"; financier Bill Ackman's view that "Harvard has become 'a political advocacy organization for one party'"; Harvard's purported role as an "incubator[] of discrimination that encourage[s] resentment and instill[s] grievance and racism into our wonderful young Americans"; and Harvard's supposed choice to "teach [its] students to despise" the "free-market system."  JA400-01.  The government stated that "today's letter marks the end of new grants for the University."  JA402.

All the while, the government's most senior officials—including the President—kept confirming that the government targeted Harvard because it disliked Harvard's faculty's speech.  The President theorized on April 16 that Harvard "hir[ed] almost all woke, Radical Left, idiots and 'bird-brains' who are only capable of teaching FAILURE to students." JA336; *see id.* (suggesting that Harvard should "be Taxed as a Political Entity" if it "keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness[.]'"); JA337 ("Leftist dopes[] are teaching at Harvard ….").  And Secretary McMahon confirmed on May 7 that the

49

government sought to coerce Harvard into "vetting professors that they're hiring to make sure that they're not teaching ideologies but that they're teaching subject matter." JA338.

This collection of government statements "proudly identifies [Harvard's] protected activity as a reason—indeed, the primary reason— [Harvard] has earned the [government's] disdain." *Jenner*, 784 F. Supp. 3d at 95. The government decreed that Harvard's academic programming "must be reformed" to fit the government's preferred ideology. JA395. And it demanded that Harvard "reduc[e]" the power of the government's perceived ideological foes. *Id.* Harvard said no. The government then stripped Harvard of its funding—and, in explaining why, sharply criticized Harvard's choices about who teaches and what is taught within the university. That pattern proves that the government acted "to punish or suppress" Harvard and its faculty's "protected expression." *Vullo*, 602 U.S. at 196.

### 2. The government's contrary arguments defy the record.

Now, in this Court, the government engages in revisionist history. The government's brief abandons the phrases used in the April and May letters and in officials' surrounding statements: "ideological capture,"

50

"Democrat," "Radical Left," or "teaching ideologies." Instead, the government's brief includes only one half-hearted reference to "[o]ther bullets" addressing "promotion of viewpoint diversity in admissions and hiring." U.S. Br. 14. Those demands, the government concedes, "concerned First Amendment-protected speech." *Id.* at 46. But the government maintains that those statements were extraneous to the government's decisionmaking process on the theory that "the Government would have terminated Harvard's funding based on unprotected conduct"—"most notably," Harvard's alleged "failure to address anti-Semitism on campus," as well as "unlawful discrimination." *Id.* at 45-46, 49-50.

The record refutes that inference, as the district court correctly held. Again, the government's communications are chock-full of statements demanding that Harvard change who teaches and what is taught. Those include the very first demand in the April 11 letter that Harvard disempower certain students and faculty—a concern unrelated to antisemitism or unlawful discrimination. JA393. The government further demanded that Harvard "must" change its faculty-hiring and admissions practices to prioritize "viewpoint diversity," "transfer[]"

51

departments or fields "not capable" of such "viewpoint diversity," and "review[]" all "faculty … for plagiarism," JA394-96—demands that also have nothing to do with antisemitism, except for a brief reference to not admitting international students "supportive of terrorism or anti-Semitism." *See* JA394.  Beyond that passing reference, only two of the ten demands in the April 11 letter mention antisemitism.  *See* JA395 (demanding program reform); JA396 (demanding reforms of student groups and disciplinary processes).  And while the government now suggests that it also aimed to address "unlawful discrimination," U.S. Br. 49-50, that rationale similarly cannot explain its viewpoint-discriminatory demands.

Meanwhile, the government's own public statements belie its assertion that it would have taken these actions solely in response to antisemitism.  The President's April 16 statement decried the "Radical Left" and did not mention antisemitism at all, JA336, while Secretary McMahon's May 7 statement acknowledged that the government targeted Harvard not only for its alleged antisemitism but "also" for "teaching ideologies," JA338.  Faced with these facts, the government cannot credibly claim that its demands regarding Harvard's academic

governance were "incidental aspects of [the] negotiation offer" that would not have affected the ultimate defunding decision. U.S. Br. 54.

The government also cannot credibly assert that the April 11 letter's speech-suppressive demands were "sufficient but not necessary" to maintain Harvard's funding. U.S. Br. 52. Certainly, the letter itself does not say so. It stated instead that "the below provisions" served "as the basis for an agreement in principle that will maintain Harvard's financial relationship with the federal government." JA393. And it stated that Harvard "must" accept the government's revisions to its academic departments. JA395; *see* A50 ("This Court … views the characterization of the April 11 letter as an 'offer' to be disingenuous, given that the letter was not at all tentative as to what rejection would mean nor did it open the door to continued discussion."). The April 11 letter also incorporated the April 3 letter, which described the demands as ones the government "regard[s] as necessary for Harvard University's continued financial relationship with the United States government." JA391; *see id.* (listing demands that "the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars"). The government neither acknowledges any of that

53

language nor cites any other evidence that it did not mean what it said in those communications.

The government's post hoc account violates the rule that because "the Government should turn square corners in dealing with the people," it "must defend its actions based on the reasons it gave when it acted." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 24 (2020) (citation omitted). And this First Amendment dispute "is not the case for cutting corners to allow [the government] to rely upon reasons" different from "its original decision." *Id.* "[T]hreat[s]" and "informal censorship" can suppress "the freedoms of expression," and permitting the government to now distort and downplay its illicit demands would "create[] hazards to protected freedoms." *Bantam Books*, 372 U.S. at 66-67, 70.

The government's remaining arguments land even further from the mark. Its claim that "Harvard's own Task Force proposed many reforms along the same lines" is neither factually accurate nor legally relevant. U.S. Br. 50. It is not accurate because Harvard's task force did not call for disempowering untenured and "activist" faculty; mandating "viewpoint diversity"-based hiring; or overhauling specific schools and departments. *See supra* at 47-48. And the government's argument is not

54

relevant because "[t]he Free Speech Clause of the First Amendment constrains governmental actors and protects private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019). Thus, Harvard's task force has a constitutional right to recommend academic change, while the government has a constitutional obligation not to coerce those changes.

Also unavailing is the government's claim that its "subsequent actions"—including "at other universities"—confirm that it "would have terminated the grants regardless" of its unlawful demands. U.S. Br. 52. The government's continued investigations hardly dispel the inference that the government sought to coerce changes to the mix of speech on Harvard's campus. To the extent the investigations are themselves borne of retaliation, they weaken rather than strengthen the government's case. *Cf. Thakur*, 176 F.4th at 1204 (finding a class likely to succeed on its viewpoint-discrimination claim based on funding terminations at the University of California).

And to the extent other investigations are legitimate, they provide a contrast with the government's shoot-first, ask-questions-later approach here. As the district court observed, the government

"terminate[d] funding … before [it] learned anything about antisemitism on campus or what was being done in response." A53-54. Indeed, the government's communications failed to identify "any specific instance" of antisemitism on Harvard's campus. A17. The "record reflects that Defendants had essentially no information about the prevalence of antisemitism at Harvard before issuing the Freeze Orders," A68, and that they had not "acknowledged or considered" actions Harvard asserted it was taking in response, A70. The irregularity of the government's antisemitism investigation "tells a story that does not match the explanation the [government] gave for [its] decision." *Dep't of Com. v. New York*, 588 U.S. 752, 784 (2019).

## III.  THE FUNDING TERMINATION VIOLATES TITLE VI.

Alternatively, the government's defunding of Harvard violated Title VI. Suppose that the government did not have retaliatory and coercive aims and instead defunded Harvard solely based on a belief that Harvard had "failed to address antisemitism on campus" and "impermissibly discriminated on the basis of race." U.S. Br. 51. In that case, the government exceeded its statutory authority under Title VI, which places "elaborate restrictions" on the government's ability to

56

defund based on violations of civil rights laws. *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). While the government invokes a regulation that it contends authorizes grant terminations, that regulation does not permit an end-run around Title VI's requirements.

### A.   The government terminated Harvard's federal funds without providing the process that Title VI requires.

Title VI prohibits discrimination "on the ground of race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Pursuant to a statutory directive, *see id.* § 2000d-1, federal agencies have adopted regulations that restate and elaborate on the statute's nondiscrimination command. *See, e.g.*, 34 C.F.R. § 100.3 (Department of Education); 45 C.F.R. § 80.3 (HHS).

Title VI also lays out particular mechanisms—with particular limitations—for enforcement. The primary mechanism is "the termination of or refusal to grant or to continue [financial] assistance." 42 U.S.C. § 2000d-1; *see Sandoval*, 532 U.S. at 289. But that significant power comes with significant protections for funding recipients. An agency may not terminate funding unless it gives notice to the recipient and has "determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1. To defund a recipient, an agency must

57

make "an express finding on the record, after opportunity for hearing, of a failure to comply." *Id.*; *see* 5 U.S.C. §§ 554(a), 556-57. Prior to any defunding, an agency must provide a "full written report" to certain "committees of the House and Senate," and it can terminate funding only "thirty days" after that notification. 42 U.S.C. § 2000d-1. Finally, the government must "limit" any defunding "to the particular program, or part thereof" that is noncompliant. *Id.* These protections are not optional: "[N]o such action shall be taken" until the agency complies with the notice requirements, and "[n]o such action shall become effective" until the agency complies with the congressional-notification rule. *Id.*

Congress had good reasons to mandate these protections. "The congressional record reflects the concern that Title VI might be used in a 'vindictive' or 'punitive' manner with respect to the 'cut off' of federal funds, and that Congress took pains to avoid this possibility." *AAUP*, 815 F. Supp. 3d at 964 (quoting 110 Cong. Rec. 7059 (1964) (statement of Sen. Pastore)). When one senator asked whether "great safeguards have been built up even to protect an individual or a jurisdiction," another responded: "Frankly, I do not see how we could have gone any further." 110 Cong. Rec. 7059 (statements of Sen. Ribicoff & Sen. Pastore).

58

Taking the government's factual account at face value, the termination of Harvard's funds needed to comply with Title VI. To start, the government's claim that Harvard engaged in "racial discrimination" squarely implicates Title VI. U.S. Br. 53. The statute prohibits discrimination "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. And "[d]iscrimination based on actual or perceived Israeli identity is of course discrimination based on national origin." A61 n.24 (quoting *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 307 (D. Mass. 2024)). Indeed, the government specifically accused Harvard of violating "Title VI" in its April 3 letter. JA391. It similarly referred to Harvard's alleged violations of "federal civil rights laws" in the April 11 letter, which "incorporate[d]" the April 3 communication. JA393. And the May 5 letter announcing the termination of federal funding declared—in addition to the government's many objections to protected expression at Harvard, *see supra* at 48-49— that Harvard failed to "comply[] with long-settled Federal Law," accusing Harvard of "racial preferencing." JA401.

Yet the defunding of Harvard failed to follow Title VI's requirements. The government did not notify Harvard of a university-

59

wide Title VI investigation prior to defunding.  The government never determined that it could not secure compliance by voluntary means.  It never held a hearing, much less one that complied with the statute's intricate requirements.  The government did not limit its defunding to any "particular program" within Harvard.  And the government neither notified Congress nor waited for the required 30-day period.

The government cannot punish Harvard for violating Title VI without following Title VI's procedural protections.  "Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means—and there is often a considerable legislative battle over what those means ought to be." *Director, Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 136 (1995).  "The withholding of agency authority is as significant as the granting of it," and courts "have no right to play favorites between the two." *Id.*  If the government wishes to investigate Harvard on the ground that it failed to comply with "Title VI," as it stated in its first letter to Harvard on this matter, it must follow that statute's procedures. JA391.  Because it failed to do so, the terminations exceed its authority.

60

**B.    No other source of authority permits the government's defunding.**

The government contests little of the above analysis. It never argues that its defunding of Harvard satisfied Title VI's "elaborate" requirements. *Sandoval*, 532 U.S. at 290. Instead, the government insists that its termination of Harvard's grants was "not pursuant to Title VI or any regulation adopted under that authority." U.S. Br. 39. It seeks to ground the termination of Harvard's grants in a separate regulation— 2 C.F.R. § 200.340(a)(4), which provides that a "Federal award may be terminated in part or its entirety" "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

The government's reliance on that regulation is misplaced for two reasons: (1) the regulation is not the actual basis for the government's action; and (2) regardless, the regulation does not authorize the government's defunding of Harvard on discrimination-related grounds.

*First*, the government's reliance on Section 200.340(a)(4) is a "post hoc attempt to remedy the failure to follow Title VI's procedures." A63. Again, the April 3, April 11, and May 5 letters refer to Title VI (or civil rights laws generally), not Section 200.340(a)(4). *See supra* at 59.

61

Section 200.340 entered the picture only after the government had announced that it had determined to "end … new grants for the University." JA402. Such "*post hoc* rationalizations of the agency … cannot serve as a predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

The government's reliance on Section 200.340(a)(4) is pretextual for another reason:  HHS—which terminated the vast majority of the grant funding at issue—had not even adopted that regulation when it terminated those grants.  Like the other agencies that terminated funding, HHS cited Section 200.340(a)(4) in its termination letter. JA782.  But at the time of the terminations, HHS "had its own set of [grant] regulations."  89 Fed. Reg. 80055, 80055 (Oct. 2, 2024).  HHS did not adopt Section 200.340(a)(4) until "October 1, 2025"—months after the terminations.  *Id.*  The government's decision to cite Section 200.340(a)(4) across the board without even accounting for its inapplicability to a key agency confirms that reliance on that regulation "seems to have been contrived."  *Dep't of Com.*, 588 U.S. at 784.

*Second*, and in any event, Section 200.340(a)(4) does not authorize the termination of Harvard's grants. The government's theory ignores the critical language of that regulation: "to the extent authorized by law." Indeed, the government even uses an ellipsis to eliminate that language from the argument section of its brief. *See* U.S. Br. 40. But that "limiting phrase matters." *Am. Council of Learned Societies v. NEH*, 2026 WL 1256545, at *36 (S.D.N.Y. May 7, 2026). Title VI is a "law." And it "authorize[s]" termination for "discrimination" on the "ground of race, color, or national origin" only following the procedures discussed above. 42 U.S.C. § 2000d. Thus, a termination for a Title VI reason that does not follow Title VI's procedures is not "authorized by law."[6]

The government's contrary arguments misunderstand both Title VI and Section 200.340(a)(4). The government correctly notes that Title VI "by its terms applies only to attempts to achieve '[c]ompliance with any requirement adopted *pursuant to this section*.'" U.S. Br. 43 (alteration and emphasis in original); *see* 42 U.S.C. § 2000d-1. But the government's

---

[6] Even on its own terms, Section 200.340(a)(4) may not authorize mass funding terminations that are not based on findings specific to each award. *See* First Am. Compl. at 75-76, *New Jersey v. OMB*, No. 25-cv-11816 (D. Mass. July 31, 2025), Dkt. 64.

actions here qualify as such an "attempt[]": Title VI imposes a requirement on funding recipients not to discriminate on the basis of race, color, or national origin, and the government, on its own account, took action to achieve compliance with that requirement. If the government seeks to terminate funding because of such alleged discrimination, it must follow the required procedures.

Section 200.340(a)(4) cannot override Title VI's requirements. "[R]egulations are not statutes," *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1104 (11th Cir. 2019), and "an agency literally has no power to act unless and until Congress confers power upon it." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citation omitted). Section 200.340(a)(4) recognizes as much, stating that an agency may terminate under that provision only "to the extent authorized by law." Here, the relevant "law" is Title VI; the government has not pointed to any statute that authorizes defunding on grounds covered by Title VI outside of that law's strictures. And even if the government could identify some generic contracting authority possessed by agencies, *see* U.S. Br. 39, "[i]t is a cardinal rule of statutory interpretation that a specific limitation takes precedence over a general grant of authority." *Branch*

*v. Umphenour*, 936 F.3d 994, 1003 (9th Cir. 2019); *see Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). Thus, Title VI's specific requirements for discrimination-related terminations would take precedence over any general grant of authority.

For that reason, requiring discrimination-related termination decisions to follow Title VI is hardly an "absurd result[]." U.S. Br. 44. Rather, it is a consequence of Congress's considered choice to add procedural protections to avoid "vindictive" or "punitive" defunding decisions. 110 Cong. Rec. 7059 (statement of Sen. Pastore). And it stems from Congress's recognition that "people and entities receiving federal funding" should be "shielded against being labeled with the 'irreversible stigma' of 'discriminator' until a certain level of agency process has determined that there was misconduct that warranted termination." A64 (citation omitted).

The government's remaining arguments do not advance its case. The government cites President Johnson's executive order concerning employment discrimination in contracting. U.S. Br. 43-44. But as the

65

Supreme Court has explained, that executive order rests on many potential sources of authority—including the Federal Property and Administrative Services Act of 1949, Title VII, and the Equal Employment Opportunity Act of 1972—that have no relevance here. *Chrysler Corp. v. Brown*, 441 U.S. 281, 304-05 (1979).

The government also points to dicta in a now-vacated district court decision suggesting that an agency can "count repudiating antisemitism among 'agency priorities' within the meaning of 2 C.F.R. § 200.340(a)(4)." *AAUP v. DOJ*, 2025 WL 1684817, at *15 (S.D.N.Y. June 15, 2025), *vacated and appeal dismissed as moot*, 175 F.4th 413 (2d Cir. 2026); *see* U.S. Br. 44-45. The underlying premise—that antisemitism falls outside of Title VI's prohibition because the statute "does not mention religion"— directly contradicts the government's own theory of this case, as shown in its communications with Harvard. *AAUP*, 2025 WL 1684817, at *15; *see supra* at 59. And as the government admits, a different district court in another suit brought by AAUP rejected its argument that "2 C.F.R. § 200.340 provides a … blank check to ignore the Title VI … processes and limits." *AAUP*, 815 F. Supp. 3d at 965; *see* U.S. Br. 45.

Finally, while the government invokes *California, NIH*, and *Sustainability Institute*, no Title VI claim was brought in those cases, and accordingly, none of those decisions discussed Title VI. *See* U.S. Br. 44. They thus have no relevance to the Title VI question at hand.

\*    \*    \*

At bottom, this case is about whether the government can use financial leverage to dictate the intellectual life of American universities. The government demanded that Harvard disempower certain students and faculty, dismantle certain disfavored programs, and prioritize the government's vision of viewpoint diversity—and threatened to terminate billions of dollars supporting essential and life-saving research if Harvard refused, all without following any of the procedures the law requires. Those actions violated the First Amendment and Title VI, and the district court had jurisdiction to say so.

## CONCLUSION

This Court should affirm the judgment below.

Dated: July 15, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*

PHILIPPE Z. SELENDY
JULIE R. SINGER
COREY STOUGHTON
DRAKE REED
AINE C. CAROLAN
SELENDY GAY PLLC
1290 Ave. of the Americas
New York, NY 10104
(212) 390-9000

ELIZABETH B. PRELOGAR
  *Counsel of Record*
EPHRAIM A. MCDOWELL
JOSHUA REVESZ
ELIAS S. KIM
COOLEY LLP
1299 Pennsylvania Ave. NW
Suite 700
Washington, DC 20004
(202) 842-7800

JOSEPH M. SELLERS
PHOEBE M. WOLFE
SABRINA S. MEROLD
COHEN MILSTEIN SELLERS & TOLL
  LLP
1100 New York Ave. NW
Suite 800
Washington, DC 20005
(202) 408-4600

DIANA G. LI
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

*Counsel for Plaintiffs-Appellees*

68

## CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,985 words.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface in 14-point Century Schoolbook font.


Dated: July 15, 2026                    Respectfully submitted,

                                        */s/ Elizabeth B. Prelogar*
                                        ELIZABETH B. PRELOGAR

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the Court's CM/ECF system. I certify that all parties or their counsel of record are registered as ECF filers and that service will be accomplished by the CM/ECF system.


Dated: July 15, 2026                    Respectfully submitted,

                                        */s/ Elizabeth B. Prelogar*
                                        ELIZABETH B. PRELOGAR

## SUPPLEMENTAL ADDENDUM

## SUPPLEMENTAL ADDENDUM
## TABLE OF CONTENTS

**Date**    **ECF**    **Document Description**                              **Page**

10/20/25    153    Order & Final Judgment, *AAUP-Harvard
Faculty Chapter v. DOJ*, No. 1:25-cv-10910
(D. Mass.) ............................................................... SA1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS–HARVARD
FACULTY CHAPTER et al.,                    Case No. 1:25-CV-10910-ADB

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
JUSTICE et al.,

      Defendants.

**ORDER AND FINAL JUDGMENT**

For all the reasons stated in this Court's September 3, 2025 Memorandum and Order, ECF

No. 141 (the "Memorandum and Order"), which is incorporated herein, and pursuant to Federal

Rule of Civil Procedure 58, it is hereby ORDERED, ADJUDGED, AND DECREED that:

1.      The Termination Letters[1] are hereby **DECLARED** to violate Title VI of the Civil

Rights Act, 42 U.S.C. § 2000d *et seq.*, under 5 U.S.C. § 706(2)(C), (D) and judgment on Count I

is therefore entered in favor of Plaintiffs on that basis.

---

[1] The term "Termination Letters" refers to: the May 6, 2025 Termination Letter from the National Institutes of Health; the May 9, 2025 Termination Letter from the United States Department of Agriculture; the May 9, 2025 Termination Letter from the National Aeronautics and Space Administration; the May 12, 2025 Termination Letter from the Department of Commerce; the May 12, 2025 Termination Letter from the Department of Defense; the May 12, 2025 Termination Letter from the Department of Energy; the May 12, 2025 Termination Letter from the Department of Housing and Urban Development; the May 12, 2025 Termination Letter from the National Science Foundation; the May 12, 2025 Termination Letter from the Department of Education; the May 19, 2025 Termination Letter from the Centers of Disease Control and Prevention; and the May 27, 2025 Termination Letter from the General Services Administration. All other capitalized terms not defined herein have the same meaning as in the Memorandum and Order.

1
**SA1**

2.      The Freeze Orders[2] are hereby **DECLARED** arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) and judgment on Count II is therefore entered in favor of Plaintiffs in part on that basis.

3.      The Freeze Orders are hereby **DECLARED** to violate the First Amendment under 5 U.S.C. § 706(2)(B) and judgment on Count IV is therefore entered in favor of Plaintiffs on that basis.

4.      The Freeze Orders are **VACATED AND SET ASIDE** as arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

5.      The Freeze Orders and Termination Letters are **VACATED AND SET ASIDE** as violative of the First Amendment under 5 U.S.C. § 706(2)(B).

6.      All freezes and terminations of funding to Harvard made pursuant to the Freeze Orders and Termination Letters on or after April 14, 2025 are **VACATED AND SET ASIDE**.

7.      The Termination Letters are **VACATED AND SET ASIDE** as violative of Title VI under 5 U.S.C. § 706(2)(C), (D).

8.      All terminations of funding to Harvard made pursuant to the Termination Letters are **VACATED AND SET ASIDE**.

9.      Defendants, their agents, and anyone acting in concert or participation with Defendants are hereby **PERMANENTLY ENJOINED** from:

    a.      Implementing, instituting, maintaining, or giving any force or effect to Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional conditions, as well as any terminations of, freezes of, or refusing to grant or to continue federal funding undertaken pursuant to the Freeze Orders and Termination Letters and their attendant unconstitutional conditions, including but not limited to:

---

[2] The term "Freeze Orders" refers to the April 14 Freeze Order and the May 5 Freeze Order as defined by the Memorandum and Order.

    (i)      The April 3, 2025 Letter from the Federal Task Force to Combat Antisemitism;

    (ii)     The April 11, 2025 Letter from the Federal Task Force to Combat Antisemitism;

    (iii)    The April 14, 2025 Freeze Order;

    (iv)    The May 5, 2025 Freeze Order;

    (v)     The May 6, 2025 Termination Letter from the National Institutes of Health;

    (vi)    The May 9, 2025 Termination Letter from the United States Department of Agriculture;

    (vii)   The May 9, 2025 Termination Letter from the National Aeronautics and Space Administration;

    (viii)  The May 12, 2025 Termination Letter from the Department of Commerce;

    (ix)    The May 12, 2025 Termination Letter from the Department of Defense;

    (x)     The May 12, 2025 Termination Letter from the Department of Energy;

    (xi)    The May 12, 2025 Termination Letter from the Department of Housing and Urban Development;

    (xii)   The May 12, 2025 Termination Letter from the National Science Foundation;

    (xiii)  The May 12, 2025 Termination Letter from the Department of Education;

    (xiv)  The May 19, 2025 Termination Letter from the Centers of Disease Control and Prevention;

    (xv)   The May 20, 2025 announcement by the Department of Health and Human Services to cut $60 million in multi-year grants to Harvard; and

    (xvi)  The May 27, 2025 Termination Letter from the General Services Administration.

    b.     Issuing any other termination, fund freezes, stop work orders, or otherwise withholding payment on existing grants or other federal funding, or

3<br><strong>SA3</strong>

refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights or the rights of its faculty and staff, for the purpose of suppressing disfavored speech, or on any purported grounds of discrimination without compliance with the terms of Title VI.

10.     Judgment shall enter in favor of Defendants and against Plaintiffs on Counts III, V, and VII. Judgment shall enter in favor of Defendants in part on Count II with respect to the claim that the Termination Letters are arbitrary and capricious for lack of subject matter jurisdiction.

11.     Judgment shall enter in favor of Defendants and against Plaintiffs on Counts VI and VIII pursuant to the parties' stipulation of dismissal with prejudice filed on September 10, 2025, ECF No. 142, and the Court's order of September 11, 2025, ECF No. 143.

12.     This Judgment constitutes final resolution of all claims and operates as a final judgment pursuant to Federal Rule of Civil Procedure 58(b)(2) and the Court's determination that "all claims have been resolved and … a final judgment should issue." ECF No. 143.

13.     The Court retains jurisdiction to enforce this Judgment.

14.     The Court expressly reserves jurisdiction over the issue of attorney's fees and costs. Any motion for attorney's fees shall be filed in accordance with Federal Rule of Civil Procedure 54(d).

The Clerk is directed to enter judgment in conformity with the foregoing forthwith.

Dated:    October 20, 2025

/s/ Allison D. Burroughs
**HON. ALLISON D. BURROUGHS**
U.S. DISTRICT JUDGE