Cooley

Elizabeth B. Prelogar
T: +1 202 776 2115
eprelogar@cooley.com

November 2, 2026

Hon. Anastasia Dubrovsky
Clerk of Court, United States Court of Appeals for the First Circuit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

**Re:** ***American Association of University Professors v. U.S. Department of Justice*, No. 25-2231 (1st Cir.)**

Dear Ms. Dubrovsky:

Pursuant to Federal Rule of Appellate Procedure 28(j), I write regarding the Fourth Circuit's recent decision in *Fairfax County School Board v. McMahon*, __ F.4th __, 2026 WL 3080601 (4th Cir. Oct. 15, 2026) (attached). The decision supports plaintiffs' argument (Br. 32-37) that their Title VI claim may proceed in district court.

*Fairfax County School Board* emerges out of two Virginia school districts' policies allowing students to use certain facilities consistent with their gender identities. Op. 5-6. The federal government asserted that those policies violated Title IX and, as a penalty, "placed the districts' grants and subgrants from the Department on a reimbursement method of payment." Op. 8 (internal quotation marks omitted). The school districts sued, contending that their policies complied with Title IX.

The Fourth Circuit held that the districts' suit fell outside the Tucker Act's bar on district court jurisdiction. It explained that the relevant "source of the rights" is "statutory, not contractual," because "the school districts' claim is not that any grant or contract entitles them to advance payment but rather that the Department cannot" impose "a penalty for violating Title IX when, in their view, they are not violating the statute." Op. 16. While "the school districts' reimbursement-status claims may 'presuppose[] the existence of a contract' under which they receive federal funds, those claims do not 'seek[] to vindicate' a contract right." *Id.* And the court held that "[t]he fact that these disputes implicate conditions on federal funds does not, by itself, mean that all forms of relief a court could appropriately order are contractual." Op. 17. Those holdings equally apply to plaintiffs' Title VI claims here.

Finally, the Fourth Circuit distinguished the cases that the government invokes here. Because "Congress expressly gave Article III courts jurisdiction to set aside agency actions terminating or suspending financial assistance based on a grant recipient's failure to comply with Title IX," the court found the case "materially different" from the grant terminations "in *California*, *National Institutes of Health*, *Sustainability Institute*, and *Solutions in Hometown Connections*." Op. 21-22. Again, the same is true of plaintiffs' Title VI claim.

Sincerely,

/s/ Elizabeth B. Prelogar
Elizabeth B. Prelogar

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-2087**

---

FAIRFAX COUNTY SCHOOL BOARD,

Plaintiff – Appellant,

v.

LINDA MCMAHON, in her official capacity as Secretary of Education of the United States; UNITED STATES DEPARTMENT OF EDUCATION,

Defendants – Appellees.

------------------------------

EQUALITY VIRGINIA; ARLINGTON GENDER IDENTITY ALLIANCE; NORTHERN VIRGINIA FAMILIES; NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.; NAACP,

Amici Supporting Appellant.

and

ALLIANCE DEFENDING FREEDOM; COMMONWEALTH OF VIRGINIA AND 20 OTHER STATES; AMERICA FIRST LEGAL FOUNDATION,

Amici Supporting Appellees.

---

**No. 25-2107**

---

ARLINGTON SCHOOL BOARD,

Plaintiff – Appellant,

v.

LINDA MCMAHON, in her official capacity as Secretary of Education of the United States; UNITED STATES DEPARTMENT OF EDUCATION,

Defendants – Appellees.

----------------------------

EQUALITY VIRGINIA; ARLINGTON GENDER IDENTITY ALLIANCE; NORTHERN VIRGINIA FAMILIES; NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.; NAACP,

Amici Supporting Appellant.

and

ALLIANCE DEFENDING FREEDOM; COMMONWEALTH OF VIRGINIA AND 20 OTHER STATES; AMERICA FIRST LEGAL FOUNDATION,

Amici Supporting Appellees.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Rossie David Alston, Jr., District Judge. (1:25-cv-01432-RDA-LRV; 1:25-cv-01434-RDA-LRV)

---

Argued: January 29, 2026 Decided: October 15, 2026

---

Before DIAZ, Chief Judge, and RICHARDSON and RUSHING, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Rushing wrote the majority opinion, in which Chief Judge Diaz concurred. Judge Richardson wrote a dissenting opinion.

---

**ARGUED:** Timothy J. Heaphy, WILLKIE FARR & GALLAGHER LLP, Washington, D.C., for Appellants. Abhishek Kambli, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Breanna Smith-Bonsu, Chloe Smeltzer, Chicago, Illinois, Joshua N. Mitchell, Fiona Carroll, Lindsay Hemminger,

WILLKIE FARR & GALLAGHER LLP, Washington, D.C., for Appellants. Stanley Woodward, Jr., Associate Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Lindsey Halligan, United States Attorney, Matthew J. Mezger, Assistant United States Attorney, Garry D. Hartlieb, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees. Jason S. Miyares, Attorney General, Kevin M. Gallagher, Solicitor General, Graham K. Bryant, Principal Deputy Solicitor General, Michael C. Dingman, Deputy Solicitor General, Leah J. DeFazio, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Tim Griffin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia. Brenna Bird, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa. Liz Murrill, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Austin Knudsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana, for Amicus State of Montana. Drew Wrigley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA, Bismarck, North Dakota, for Amicus State of North Dakota. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Jonathan Skrmetti, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE, Nashville, Tennessee, for Amicus State of Tennessee. Derek Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Stephen J. Cox, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALASKA, Anchorage, Alaska, for Amicus State of Alaska. James Uthmeier, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida, for Amicus State of Florida. Theodore Rokita, Attorney General OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana. Kris Kobach, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas. Catherine L. Hanaway, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSOURI, Jefferson City, Missouri, for Amicus State of Missouri. Michael T. Hilgers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Dave Yost, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio. Marty J. Jackley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH DAKOTA, Pierre, South Dakota, for Amicus State of South Dakota. Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Keith G. Kautz, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WYOMING,

Cheyenne, Wyoming, for Amicus State of Wyoming. Erin M. Hawley, Natalie D. Thompson, ALLIANCE DEFENDING FREEDOM, Washington, D.C., for Amicus Alliance Defending Freedom. Joseph J. Wardenski, WARDENSKI P.C., New York, New York, for Amici Equality Virginia, Arlington Gender Identity Alliance, and Northern Virginia Families. Katrina Feldkamp, New York, New York, Deuel Ross, Washington, D.C., Kelly Gardner, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., Atlanta, Georgia, for Amici NAACP Legal Defense & Educational Fund and NAACP. Andrew J. Block, Ian D. Prior, AMERICA FIRST LEGAL FOUNDATION, Washington, D.C., for Amicus America First Legal Foundation.

RUSHING, Circuit Judge:

After an investigation, the United States Department of Education's Office for Civil Rights determined that the Fairfax County Public School District and the Arlington Public School District were violating Title IX, which prohibits discrimination on the basis of sex in any education program or activity receiving federal financial assistance. When the parties could not reach a negotiated resolution, the Secretary of Education designated the school districts as "high-risk" entities within the federal grant system—with the added condition that federal funds from the Department be available to the school districts only by a reimbursement method of payment—until they correct their Title IX violations. The school districts sued the Department and the Secretary of Education under the Administrative Procedure Act. The school districts asked the district court to declare that they were not violating Title IX, to set aside the high-risk designations, and to enjoin any further enforcement actions. The district court sua sponte dismissed the complaints for lack of jurisdiction, concluding that the Tucker Act gives the Court of Federal Claims exclusive jurisdiction to adjudicate these lawsuits. We disagree and so vacate and remand for further proceedings.

I.

This dispute concerns the school districts' policies about sex-segregated facilities. Under the policy adopted by the Fairfax County School Board, "[g]ender-expansive and transgender students" in Fairfax County schools must be allowed to use "a locker room or restroom consistent with the student's gender identity." J.A. 57. When school activities require "students to be accommodated overnight, students may be assigned to a room

consistent with the student's gender identity." J.A. 57. The policy forbids schools from requiring "a gender-expansive or transgender student . . . to use a locker room or restroom that conflicts with the student's gender identity or . . . to us[e] only a private area, single-occupancy accommodation, or other single-use facility." J.A. 57–58.

The Arlington School Board has adopted a similar policy. It requires that "all students" in Arlington public schools be given access to bathrooms and locker rooms "that correspond to a student's gender identity." J.A. 271. When school activities require overnight accommodations, "students may be assigned to a room consistent with the student's gender identity," and schools must "maintain confidentiality of nonpublic information about students" when making such room assignments. J.A. 271–272. School officials "shall not require a student to stay in a single-occupancy accommodation when such accommodations are not required of other students participating in the same event." J.A. 272.

In February 2025, the Department of Education's Office for Civil Rights (OCR) received a complaint about the school districts' policies. Invoking its authority to "enforce[] Title IX . . . and its implementing regulation," OCR opened an investigation into whether the school districts' policies violate Title IX. J.A. 61. In response to OCR requests, the school districts produced documents and information. The districts also defended the legality of their policies. Among other things, the school districts argued that their policies not only complied with, but were actually required by, Title IX as this Court interpreted it in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020).

Upon completing its investigation, OCR found both school districts (and three other school districts that are not parties here) to be "in violation of Title IX and its implementing regulations." J.A. 78. In a 21-page "Letter of Findings," OCR "set[] forth [its] determination in [these] individual OCR case[s]." J.A. 96. OCR disagreed with the school districts' interpretation of Title IX and, in particular, reasoned that *Grimm* "does not shield" the districts from liability. J.A. 89. Invoking its authority under 20 U.S.C. § 1682 "to issue and enforce regulations to effectuate" Title IX, OCR explained its view that Title IX and pertinent regulations support "sex-separated sensitive facilities" and that allowing access to such facilities on the basis of gender identity harms students, especially girls. J.A. 82–83, 88–89. Consequently, OCR concluded that the school districts' "bathroom, locker room, and sex-segregated intimate facilities policies or regulations violate Title IX and its implementing regulations because they permit access to intimate facilities that correspond with a student's 'gender identity,' which, in turn, requires students to use these intimate facilities in the presence of members of the opposite sex," thereby "facilitating the significant deleterious effects . . . that Title IX seeks to prevent." J.A. 89.

With the Letter of Findings, OCR sent the school districts a "draft resolution agreement" specifying the actions that would "remedy the violation of Title IX." J.A. 97. The resolution agreement required the districts to rescind their policies about access to intimate facilities and to issue a memorandum to their schools defining pertinent terms, including "male" and "female." OCR warned the school districts that refusing to voluntarily execute an agreement would result in "a letter of impending enforcement action." J.A. 97.

The school districts did not comply with OCR's demands. Accordingly, based on the school districts' continuing "violation of Title IX," the Department of Education commenced "administrative proceedings seeking suspension or termination of federal financial assistance" to both districts and designated the districts as "'high-risk' within the federal grant system." J.A. 44–45. As part of the high-risk designation, the Department placed the districts' "grants and subgrants from the Department" on "a reimbursement method of payment" until the districts take "adequate corrective actions" to comply with federal law, which "could include actions laid out in the OCR proposed resolution agreement." J.A. 51, 268. The reimbursement condition requires each district, whenever it "submits a request to drawdown funds for a particular obligation it intends to charge to a Department grant," to "submit . . . documentation establishing that the expenditure in question can be allowably charged to the grant and has already been paid for . . . with non-Federal funds." J.A. 51, 268. The Department warned the school districts that failure to resolve their Title IX violations could result in "additional enforcement actions, including the possible termination of all or some of the Department's grants." J.A. 51, 268.

A few days later, the school districts each filed separate complaints under the Administrative Procedure Act (APA) in the United States District Court for the Eastern District of Virginia.[1] They also moved for preliminary injunctive relief. In their six-count complaints, the school districts alleged that the high-risk designation was arbitrary and

[1] Before filing suit, the school districts submitted requests for reconsideration to the Department, and those requests remained pending when the districts filed their complaints.

capricious, that the Department's "action constructively terminating or refusing to continue funds" was "not in accordance with the law set forth in *Grimm*," and that the Department acted contrary to the Spending Clause of the Constitution. J.A. 30, 247. The school districts sought various relief that can be grouped into three categories. First, they asked the district court to "vacate and set aside" the high-risk designations, "Defendants' action constructively denying funds," and "any other . . . actions taken . . . to implement [a] freeze on federal funds allocated" to the districts. J.A. 38, 255. Second, they asked the district court to declare that their policies do not violate Title IX, that *Grimm* is "valid and binding" precedent, and that "Defendants' conditioning and freezing of federal funds" violates the APA and the Spending Clause. J.A. 38, 255–256. Third, they asked the court to enjoin Defendants from "taking enforcement action" against them and from "conditioning, terminating, freezing, or otherwise impeding [their] access to federal funds" and to "[r]equire that Defendants immediately pay . . . any funds that have been denied" on the basis of the school districts' alleged Title IX violations.[2] J.A. 39, 256.

The district court consolidated the cases and sua sponte dismissed both complaints for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). In the court's view, "almost every count in the Complaint contains specific references to grants, funds, or reimbursements," and the school districts "base[d] their Complaints around requests to order the payment of money." *Fairfax Cnty. Sch. Bd. v. McMahon*, 798 F. Supp. 3d 563,

---

[2] The school districts did not allege that the Department had actually denied them any funds. On appeal, the districts have confirmed that they have not been denied any funds.

571 (E.D. Va. 2025) (internal quotation marks omitted). The court reasoned that the Tucker Act vests the Court of Federal Claims with jurisdiction to enforce the federal government's contractual obligations to pay money, therefore the district court lacked jurisdiction to order the requested relief or to entertain the complaints at all. *See id.* at 571–572 (citing *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025); *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)).

The school districts timely appealed. They sought injunctions pending appeal, which we denied.

II.

The only question we consider in this consolidated appeal is whether the district court lacked subject matter jurisdiction to adjudicate every claim in the school districts' complaints because of the Tucker Act. We have appellate jurisdiction, 28 U.S.C. § 1291, and our review is de novo, *Rich v. United States*, 811 F.3d 140, 144 (4th Cir. 2015).

"It is axiomatic that the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction." *Sustainability Inst. v. Trump*, 165 F.4th 817, 825 (4th Cir. 2026) (internal quotation marks omitted). Plaintiffs allege that the APA waives the federal government's sovereign immunity for their challenges to the Department's Title IX enforcement actions. We begin by describing the statutory scheme for judicial review of Title IX enforcement proceedings before turning our attention to the Tucker Act and the district court's reasoning.

A.

Title IX provides that, subject to certain exceptions, no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Federal agencies that distribute education funding are authorized to issue rules and regulations to effectuate Title IX, and they may enforce those requirements through proceedings to terminate or suspend federal funding or "by any other means authorized by law." *Id.* § 1682; *see Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280–281, 288 (1998). The agency must pursue voluntary compliance before resorting to enforcement proceedings. 20 U.S.C. § 1682; 34 C.F.R. §§ 100.7(d)(1), 100.8(c), (d); *Gebser*, 524 U.S. at 288.

"Any department or agency action taken pursuant to" the authority in Section 1682 to enforce Title IX and its implementing regulations is "subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds." 20 U.S.C. § 1683. For example, when the Secretary of Education withholds payment of federal funds, orders recovery of funds from a grant recipient, or issues a cease-and-desist order to compel compliance with the law, those actions are subject to judicial review in the federal court of appeals for the circuit where the funding recipient is located. *Id.* § 1234g; *see id.* §§ 1234a, 1234d, 1234e; *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 604–605 & n.25 (6th Cir. 2024). Congress has authorized the court of appeals to affirm the Secretary's action or "to set it aside, in whole or in part." 20 U.S.C. § 1234g(d). If agency action "terminating or refusing to grant or to continue financial

assistance upon a finding of failure to comply with any requirement imposed pursuant to [S]ection 1682" is "not otherwise subject to judicial review," then "judicial review of such action" is available in accordance with the APA. *Id.* § 1683.

But denial or withholding of funds is not the only way the Department enforces Title IX. It may also take actions short of termination or suspension to enforce Title IX's requirements. *Id.* § 1682 (authorizing federal agencies to enforce Title IX regulations "by any other means authorized by law"); *see id.* § 1234c(a)(4) (authorizing the Secretary to "take any other action authorized by law" when a recipient of funds fails to "comply substantially with any requirement of law applicable to" its funding). Those enforcement actions are also "subject to such judicial review as may otherwise be provided by law for similar action" taken by the Department on other grounds. *Id.* § 1683. In some circumstances, this may include judicial review under the APA. *See Tennessee*, 104 F.4th at 603–605. For example, when the Department has transferred funding recipients to reimbursement status on grounds other than Title IX compliance, *see* 20 U.S.C. § 1226a-1, district courts have considered challenges to such actions under the APA. *See*, *e.g.*, *Instituto de Educacion Universal Corp. v. Riley*, 973 F. Supp. 95, 97 (D.P.R. 1997); *see also Bowling Green Jr. Coll. v. U.S. Dep't of Educ.*, 687 F. Supp. 293, 297 (W.D. Ky. 1988); *cf. Bell v. New Jersey*, 461 U.S. 773, 792 (1983) (articulating a presumption of APA review of Section 1226a-1 adjustments to recover funds before the 1978 statutory amendments provided judicial review in the courts of appeals).

The APA entitles a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute"

to judicial review. 5 U.S.C. § 702. It waives the federal government's sovereign immunity for actions "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." *Id.* In such a case, the reviewing court may hold unlawful and set aside agency action and can compel agency action unlawfully withheld. *Id.* § 706.

Here, the school districts seek judicial review of actions the Department has taken to enforce Title IX and its implementing regulations against them pursuant to Section 1682. The school districts challenge the Department's finding that their sex-segregated facilities policies violate Title IX and the condition placing the districts on reimbursement status for all Department funds until they rescind their allegedly unlawful policies. They ask the district court to hold unlawful and set aside the Department's findings that they are violating Title IX and are therefore high-risk entities because those actions are allegedly arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Congress has waived the federal government's sovereign immunity in district court for these types of claims. *See id.* §§ 702, 703, 706; 20 U.S.C. § 1683. The school districts also ask the district court to enjoin the Department from taking further enforcement actions against them on the basis of their alleged Title IX violations. We do not opine on the ripeness of this claim, or any of the school districts' claims, but such an injunction is a kind of equitable relief for which the APA waives sovereign immunity.

B.

The district court held that the Tucker Act gives the Court of Federal Claims exclusive jurisdiction over all the claims in these cases. *Fairfax*, 798 F. Supp. 3d at 571.

In the Tucker Act, Congress gave what is now the Court of Federal Claims jurisdiction over a variety of claims against the United States. *See* 28 U.S.C. § 1491. In the absence of a statute authorizing judicial review in another court, the Court of Federal Claims is the only court with jurisdiction to hear contract claims against the United States for more than $10,000. *See id.* § 1491(a)(1) (granting the Court of Federal Claims jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States"); *id.* § 1346(a)(2) (granting district courts jurisdiction to hear claims "against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States"). Thus, the Court of Federal Claims' jurisdiction is "exclusive" in this regard "only to the extent that Congress has not granted any other court authority to hear the claims." *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988).

"'A plaintiff whose claims against the United States are essentially contractual is not allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA.'" *Sustainability Inst.*, 165 F.4th at 825 (brackets and ellipsis omitted) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). Indeed, the APA's waiver of sovereign immunity "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).

The question, then, is whether the school districts' complaints contain only claims "founded . . . upon . . . contract." 28 U.S.C. § 1491(a)(1). "To determine whether a claim is 'at its essence a contract claim,' courts examine 'the source of the rights upon which the plaintiffs base their claims' and 'the type of relief sought (or appropriate).'" *Sustainability Inst.*, 165 F.4th at 825–826 (brackets omitted) (quoting *Megapulse*, 672 F.2d at 968). In undertaking this inquiry, courts "should attempt 'to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds.'" *United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995) (quoting *Megapulse*, 672 F.2d at 969–970).

The school districts seek a declaration that their sex-segregated facilities policies do not violate Title IX and that the Department therefore cannot bring enforcement actions against them, label them as high-risk, or place them on reimbursement status until they change their allegedly unlawful policies. The source of law that supposedly guarantees them this relief is Title IX, as interpreted by this Court in *Grimm*. The school districts do not assert that any grant or contract terms entitle them to retain their policies, avoid an enforcement action, or not be labeled high-risk. Nor do the school districts identify or seek to enforce any contract term that allegedly requires advance payment of federal financial assistance rather than reimbursement. Indeed, neither the school districts nor the Department claims that payment by a method other than reimbursement is a term of the

districts' federal grants or subgrants.[3] *See* 20 U.S.C. § 1226a-1 ("Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement . . . as the Secretary may determine.").

Although the school districts' reimbursement-status claims may "presuppose[] the existence of a contract" under which they receive federal funds, those claims do not "seek[] to vindicate" a contract right. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1110 (D.C. Cir. 2022). In other words, the school districts do not seek to enforce the terms or obligations of their grants or subgrants with the federal government. At its essence, the school districts' claim is not that any grant or contract entitles them to advance payment but rather that the Department cannot place them on reimbursement status as a penalty for violating Title IX when, in their view, they are not violating the statute. The "'source of the rights'" asserted in these claims is statutory, not contractual. *Sustainability Inst.*, 165 F.4th at 825 (quoting *Megapulse*, 672 F.2d at 968); *see*, *e.g.*, *Crowley*, 38 F.4th at 1108–1109 (reasoning that plaintiff's claims were not, at their essence, contractual when "determining whether the [government agency] infringed [plaintiff's] rights as alleged in the complaint requires primarily an examination of the statutes the [agency] has purportedly violated, not of [plaintiff's] contract").

---

[3] The school districts represent that almost all of the federal aid they receive is passed through to them from the Virginia Department of Education and is paid on a reimbursement basis. Fairfax County Public Schools has identified two types of federal funding it receives directly from the federal government, only one of which it receives on a basis other than reimbursement. Arlington Public Schools has not identified any funds it receives directly from the federal government, nor has it identified any funding it receives on a basis other than reimbursement.

As for "'the type of relief sought,'" the school districts have requested at least some relief that is not contractual in nature. *Sustainability Inst.*, 165 F.4th at 825–826 (quoting *Megapulse*, 672 F.2d at 968). For example, the school districts asked the district court to declare that their policies do not violate Title IX, to set aside their high-risk designations, and to enjoin the Department from taking future enforcement actions against them on the ground that their policies violate Title IX. None of this relief sounds in contract like the classic contractual remedies of money damages and specific performance do. *See id.* at 828; *Crowley*, 38 F.4th at 1110. The fact that these disputes implicate conditions on federal funds does not, by itself, mean that all forms of relief a court could appropriately order are contractual. *See California*, 145 S. Ct. at 968 ("[A] district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." (quoting *Bowen*, 487 U.S. at 910)).

The district court and the Department emphasize the school districts' requests for an order requiring the Department to "immediately pay . . . any funds that have been denied" as a result of the enforcement actions.[4] J.A. 38–39, 256; *see Fairfax*, 798 F. Supp. 3d at 571. Even if the district court would lack jurisdiction to order that relief or to grant

[4] The parties agree that, as of yet, no funding has been denied, withheld, or terminated. If the Department were to deny a reimbursement request submitted by one of the school districts, a lawsuit in which the district asserts a right to reimbursement of that expenditure may raise different jurisdictional questions.

The Department emphasizes that the enforcement process is ongoing and that the Department would follow the administrative process before terminating federal financial assistance. A decision to suspend or terminate financial assistance on the basis of a Title IX violation is subject to judicial review as provided by statute. *See* 20 U.S.C. §§ 1234g, 1683.

similar requests to "set aside" Department actions "denying funds," J.A. 38, 255, it does not follow that the district court lacks jurisdiction over the school districts' entire complaints. *See Nat'l Insts. of Health*, 145 S. Ct. at 2661 (Barrett, J., concurring) (distinguishing among the claims asserted, one of which the district court lacked jurisdiction to hear and another which it could rightly entertain). As we have just discussed, the school districts raise claims and seek at least some relief that is not contractual in nature.[5]

C.

The district court relied on recent decisions denying or staying preliminary injunctions for lack of jurisdiction. But those decisions do not counsel dismissal of the complaints here.

We begin with a pair of Supreme Court decisions staying district court injunctions pending appeal. In *Department of Education v. California*, the district court had entered an order on the plaintiffs' APA claims "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]." 145 S. Ct. at 968. The Supreme Court stayed the order because the Government was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under

[5] The dissent, like the district court, focuses almost exclusively on the school districts' "demand [for] money," Diss. Op. 30, to the exclusion of other relief they request, like an injunction forestalling any further Title IX enforcement action. That claim may be vulnerable to dismissal for other reasons, *see id.* at 36 n.7—a decision we leave to the district court in the first instance—but not because the Tucker Act entrusts all disputes about Department of Education enforcement actions to the Court of Federal Claims.

the APA." *Id.* The Court explained that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" in that case. *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

In *National Institutes of Health v. American Public Health Association*, the Supreme Court again stayed a district court order when the court had "vacat[ed] the Government's termination of various research-related grants." 145 S. Ct. at 2659. The Supreme Court explained that "[t]he Administrative Procedure Act's limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (internal quotation marks and brackets omitted).

Our Court applied these decisions in another pair of injunction appeals. In *Sustainability Institute v. Trump*, the district court, proceeding under the APA, had set aside "the freeze and/or termination" of the plaintiffs' environmental and agricultural grants and "direct[ed] the Government to restore Plaintiffs' access to grant funds immediately." 165 F.4th at 821 (internal quotation marks and brackets omitted). We vacated the district court's permanent injunction for lack of jurisdiction, finding it indistinguishable from the orders in *California* and *National Institutes of Health*.[6] The plaintiffs identified "no source of law, besides their grant agreements, guaranteeing them the relief they [sought]:

[6] We separately vacated a preliminary injunction the district had entered on the plaintiffs' "Separation of Powers and ultra vires claims" because the plaintiffs were unlikely to succeed on the merits of those claims. *Sustainability Inst.*, 165 F.4th at 829.

continued payment on [their] grants." *Id.* at 827. And the relief the district court ordered—reinstatement of the plaintiffs' grants—was "'the classic *contractual* remedy of specific performance.'" *Id.* at 828 (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)).

In *Solutions in Hometown Connections v. Noem*, the district court had denied the plaintiffs' motion for a preliminary injunction restoring immigration grants that the Department of Homeland Security had terminated. 165 F.4th 835, 839–840 (4th Cir. 2026). The district court reasoned that it likely lacked subject matter jurisdiction to award such relief on the plaintiffs' APA claims, and this Court affirmed. *Id.* at 837, 843–844. As we explained, the plaintiffs' claims for relief were "grounded only on alleged contractual obligations to fund their grants" and sought an order directing the Department of Homeland Security to reinstate and pay money pursuant to those grants. *Id.* at 843–844.

While these decisions are instructive, they do not dictate dismissal of the school districts' complaints as the district court believed. In all of these cases, the federal government had terminated specific grants and the plaintiffs had sought court orders under the APA requiring the Government to honor those grants and continue paying them. The question in each case was whether the district court had jurisdiction to enter the requested "order[] to enforce a contractual obligation to pay money." *California*, 145 S. Ct. at 968 (internal quotation marks omitted). Here, by contrast, the question is whether the district court lacks jurisdiction to consider every claim in the school districts' complaints. To be sure, the school districts requested an order requiring the Department to "immediately pay" any funds that have been denied as a result of the enforcement actions and to "set aside"

Department actions "denying funds." J.A. 38–39, 255–256. But they also sought other relief, like a judgment declaring that their policies do not violate Title IX and orders setting aside their high-risk designations and enjoining the Department from taking further enforcement actions against them on the ground that their policies are unlawful. As previously discussed, even if the district court would lack jurisdiction to order some of the relief the school districts request, it nevertheless possesses jurisdiction to adjudicate other claims they raise.

Further, none of the recent injunction cases arose out of Title IX enforcement actions. In each case, the plaintiffs' claims were "grounded only on alleged contractual obligations to fund their grants." *Solutions in Hometown Connections*, 165 F.4th at 843–844. Here, by contrast, the core of the school districts' claims is not that the Department has breached its contractual obligations but rather that the Department is enforcing Title IX against them when, in their view, they have not violated the statute. Those claims are not "'based on' the . . . grants"; they are based on Title IX and its implementing regulations. *Nat'l Insts. of Health*, 145 S. Ct. at 2660 (quoting *California*, 145 S. Ct. at 968). We also observe that Congress expressly gave Article III courts jurisdiction to set aside agency actions terminating or suspending financial assistance based on a grant recipient's failure to comply with Title IX and its implementing regulations. *See* 20 U.S.C. § 1683; *see also id.* § 1234g. This framework of agency enforcement and judicial review is materially different from the context in which the Government terminated the grants in *California*,

*National Institutes of Health*, *Sustainability Institute*, and *Solutions in Hometown Connections*.[7]

In sum, the district court erred by concluding that the recent injunction decisions dictated that it lacked jurisdiction over all the claims in these complaints as a whole. Justice Barrett's controlling opinion in *National Institutes of Health* sets the example. There, Justice Barrett distinguished between the two "distinct agency actions" before the Court, concluding that the district court likely "had jurisdiction to entertain [one] APA challenge" but not the other. 145 S. Ct. at 2661 (Barrett, J., concurring). That approach cautions against dismissing an entire complaint when only one claim or request for relief may fall beyond the district court's jurisdiction. Because the school districts have asserted some

[7] In the dissent's view, the Court of Federal Claims has exclusive jurisdiction over claims founded upon enforcement of Spending Clause legislation. *See* Diss. Op. 32–34. "[C]ompliance with Title IX is a condition" of receiving federal funds, *id.* at 33, so the dissent reasons that a recipient's challenge to Department enforcement proceedings against it is contractual, *id.* at 25–26, and the Tucker Act channels all such suits to the Court of Federal Claims.

Congress has said something quite different. For example, Congress has given "the United States Court[s] of Appeals" jurisdiction to review and "set . . . aside" Department enforcement actions withholding funds from a grant recipient for failure to comply with any legal requirement applicable to such funds. 20 U.S.C. § 1234g(b), (d); *see id.* §§ 1234c, 1234d; *cf. Bell*, 461 U.S. at 777–778 (holding court of appeals had jurisdiction over challenge to Department action to recoup misused federal grant money pursuant to 20 U.S.C. § 1234d, which was later moved, as amended, to 20 U.S.C. § 1234g). And Congress has given district courts jurisdiction to review Title IX enforcement actions "terminating or refusing to grant or to continue financial assistance" that are not otherwise subject to judicial review. 20 U.S.C. § 1683; *see, e.g.*, *Grove City College v. Bell*, 465 U.S. 555, 561–562 (1984) (reviewing agency action "terminating federal financial assistance" to college for "noncompliance with Title IX" (internal quotation marks omitted)); *Grove City College v. Harris*, 500 F. Supp. 253, 262–264 (W.D. Pa. 1980) (relying on 20 U.S.C. § 1683 for jurisdiction).

claims that are not at their essence contractual, the district court erred in dismissing these complaints in full for lack of jurisdiction.

III.

We conclude that the Tucker Act did not deprive the district court of subject matter jurisdiction to adjudicate every claim in the school districts' complaints. Having addressed the ground on which the district court ruled, we go no further. The Department has asserted other threshold objections to jurisdiction and to merits consideration, and nothing in our decision should be construed as ruling on those contentions, which we leave for the district court to address in the first instance.

*VACATED AND REMANDED*

RICHARDSON, Circuit Judge, dissenting:

Several school districts want the Department of Education to restore advance payments under their federal grants. After concluding that the districts were violating Title IX, the Department required them to incur expenses and seek reimbursement. The districts sued to restore advance payments. That demand for prepayment under their grant contracts is the gravamen of their claims.

Congress assigned such contractual claims against the United States to the Court of Federal Claims. 28 U.S.C. §§ 1491(a)(1), 1346(a)(2); *Sustainability Inst. v. Trump*, 165 F.4th 817, 825 (4th Cir. 2026). Plaintiffs cannot bypass Congress' choice and sneak into district court by dressing up a contract claim in statutory clothes. The Supreme Court has stayed district-court orders requiring the payment of federal grants under the APA, concluding that those claims likely belong in the Court of Federal Claims. *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025). We have reached the same conclusion about similar grants. *Sustainability Inst.*, 165 F.4th at 821; *Solutions in Hometown Connections v. Noem*, 165 F.4th 835, 837 (4th Cir. 2026). So did the court below.

But the majority disagrees and treats these claims as "based on Title IX." Majority Op. 21. They are not. Title IX provides the *reason* why the Department changed how it pays the districts. But the grants create the *right* the districts seek to enforce: the right to be paid in advance. The majority confuses the reason with the right.

Whether the districts are violating Title IX is not before us. The only question is where their claims belong. Because they belong in the Court of Federal Claims, I respectfully dissent.

## I. THE TUCKER ACT

The Tucker Act applies when a claim against the United States exceeding $10,000 is "founded . . . upon any express or implied contract with the United States." 28 U.S.C. §§ 1491(a)(1), 1346(a)(2). For such claims, the Tucker Act "vest[s] subject matter jurisdiction exclusively in" the Court of Federal Claims. *Sustainability Inst.*, 165 F.4th at 825. The districts' claims are founded upon their federal awards, which are contracts for Tucker Act purposes. *See Dep't of Educ.*, 604 U.S. at 651.

Federal grants are not free money. They come with conditions. The districts accepted the grant funds in exchange for a promise to comply with federal conditions, including Title IX. *See Litman v. George Mason Univ.*, 186 F.3d 544, 551 (4th Cir. 1999). Under Title IX's regulations, federal grants are conditioned upon "the applicant or recipient" providing an assurance of compliance. 34 C.F.R. § 106.4(a). And the regulations authorize the Department to require the same assurance of subgrantees. 34 C.F.R. § 106.4(c). The districts gave the required assurances as a condition of receiving federal funds. The resulting bargain illustrates why Title IX has long been understood to be "in the nature of a contract." *Litman*, 186 F.3d at 551. A promise to perform (by complying with Title IX) in consideration of money (the federal grants) is hornbook contract law.

When the Department imposed the reimbursement requirement, the districts sued the Department to remove that requirement and restore advance payments. The districts pleaded a direct award relationship with the Department and demanded payment under the bargain they struck. They cannot evade the Tucker Act's exclusive jurisdiction by disclaiming it. Pleading a dispute over grant payments in the vocabulary of Title IX does not change these claims' fundamental nature. They are contractual through and through.

A claim is "founded upon" a contract when a contractual promise supplies an *essential* legal premise of the claimant's asserted right to relief. To "found" something means to lay its basis or establish it on a supporting foundation.[1] We therefore ask what a claim rests on, not what it recites. In doing so, we look past the complaints' framing and examine the source of the asserted right, the injury inflicted, and the nature of the relief sought. *Sustainability Inst.*, 165 F.4th at 825–26; *United States v. J&E Salvage Co.*, 55 F.3d 985, 988–90 (4th Cir. 1995); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also Schillinger*, 155 U.S. at 169.

**A. The Asserted Right**

Consider first the districts' asserted right. They claim the right to receive federal funds in the manner originally used for their grant awards. If that right exists, it derives from the underlying grant contracts. Title IX does not prescribe how grants are paid, much

[1] The Tucker Act's operative phrase is old. Since 1855, Congress has sent claims "founded upon" a contract with the United States to the Court of Claims, and now, to the Court of Federal Claims. Act of Feb. 24, 1855, ch. 122, 10 Stat. 612 (quoted in *Schillinger v. United States*, 155 U.S. 163, 166 (1894)); 28 U.S.C. § 1491(a)(1). To "found" is "[t]o lay the basis of any thing." Noah Webster, *An American Dictionary of the English Language* (1828). This phrase thus directs us to the legal right on which the claims rest.

less guarantee advance payment. The APA likewise does not create a substantive right to grants; it provides a cause of action. At bottom, every right the districts invoke begins and ends with their grants.

The D.C. Circuit addressed a similar issue in *Spectrum Leasing Corp. v. United States*. 764 F.2d 891 (D.C. Cir. 1985). There, a government contractor argued that its right to payment came from the Debt Collection Act rather than its contract. The D.C. Circuit disagreed: "The right to these payments is created in the first instance by the contract, not by the Debt Collection Act. The [Act], even if it applied, confers no such right in the absence of the contract itself." *Id.* at 894. The Act "might impose procedural requirements on the government having some impact on the contract," but it "in no way creates the substantive right to the remedy Spectrum seeks." *Id.* Replace the Debt Collection Act with Title IX, and the same reasoning applies here.

Consider, by contrast, a right that presupposes a contract but flows from a statute. In *Crowley Government Services, Inc. v. General Services Administration*, a government contractor challenged GSA's statutory authority to audit its bills. 38 F.4th 1099 (D.C. Cir. 2022). The Transportation Act gave GSA authority to audit "transportation bills of any federal agency." *Id.* at 1103 (quoting 31 U.S.C. § 3726). Crowley sued GSA, arguing that its transportation-coordination services for the Department of Defense generated no "transportation bills" subject to GSA's statutory auditing authority. Rather than invoking any contractual right against the Department of Defense, Crowley asserted a statutory right: the right to be free from audits not authorized by the Transportation Act. *Id.* at 1104, 1108.

Crowley's claim was not founded upon contract. True, Crowley had bills because of a contract with the Department of Defense. In that sense, the claim "presuppose[d]" the existence of a contract. *Id.* at 1110. But Crowley did not "seek[] to vindicate" a contractual right. *Id.* Nor did Crowley's claim turn on the nature or terms of the contract. Instead, the claim rested on whether the Transportation Act applied to the bills. Crowley's contract did not hold the claim up. Take away the contract, and the claim would survive so long as Crowley still had bills, because Crowley's right was statutory. Take away the districts' grant contracts, and their entire case evaporates. The districts assert a right to advance payments. If that right exists, it derives from their grant contracts. Without such contracts, they have no rights to vindicate. *Crowley* was founded upon a statute. This case is founded upon contract.[2]

The nature of the statutes at play highlights the difference. In *Crowley*, the Transportation Act applied directly: It regulated all transportation bills submitted to federal agencies by subjecting them to GSA's audit. 38 F.4th at 1103; 31 U.S.C. § 3726(b). Title IX, by contrast, regulates only those who consent to it in exchange for federal grants. *Litman*, 186 F.3d at 551.

---

[2] *Bowen v. Massachusetts* shows the difference a money-mandating statute can make. 487 U.S. 879 (1988). There, Massachusetts sued to enforce a statute directing that the Secretary "shall pay" specified amounts. *Id.* at 900. The right to payment sat in the statute, so the claim did not depend on any agreement. Title IX says nothing of the kind. It says that no person shall be subjected to discrimination on the basis of sex under any education program receiving federal financial assistance. 20 U.S.C. § 1681(a). That is a command to recipients, not a promise of payment.

The Department doles out funds in exchange for, among other things, compliance with Title IX. The parties dispute whether the districts have upheld their end of the deal by so complying. But the districts assert no substantive rights under Title IX. The statutory dispute is only a steppingstone along the districts' path to their true destination: payment at a particular time and in a particular manner. The parties' contracts are no ancillary matter; they lie at the core of the dispute. So the districts' claims do more than presuppose a contract. They seek to vindicate a core contractual right.[3]

**B. The Alleged Injury**

Next, consider the districts' alleged injury, which is inseparable from the grant awards. The Department determined that the districts failed to satisfy a condition of their grant payments—compliance with Title IX. As a result, the Department altered their payment method. The districts assert that they have fully complied with that Title IX condition and that the Department has thus failed to perform under the contracts by moving them to reimbursement. That is their injury. The Department levied no fine, revoked no license, and imposed no sanction independent of the districts' awards. An injury caused by an impairment of the districts' contractual right to payment points to claims founded upon those contracts. Imagine a school that had the same bathroom policies but no grant award. That school would not be subject to Title IX. And if the Department still found that this

[3] The districts, correctly in my view, do not argue that the regulatory scheme provides rights independent of the grant contracts. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("That the [condition] also arguably violates certain other regulations does not transform the action into one based solely on those regulations."); *cf.* 2 C.F.R. § 200.211(c)(1)(i) (requiring incorporation of regulatory terms into the grants themselves).

hypothetical school violated Title IX, that school would suffer no injury. The Department would have no enforcement mechanism because there would be no payment to alter.

The nature of the injury also explains where earlier cases drew the line. A challenge to an agency guidance document, for instance, is not founded upon contract. By itself, guidance causes no injury for which a contract is an essential legal premise of the right to relief. *Nat'l Insts. of Health*, 145 S. Ct. at 2660–62 (Barrett, J., concurring). A guidance document does only what its name implies: It gives guidance. It speaks generally, to parties with and without contracts. Only when an agency applies the guidance and thereby causes a contractual injury is the Tucker Act implicated. Because a guidance document itself causes no contractual injury, vacating such guidance does not reinstate a grant or the grant's method of payment. *Id.* at 2661. For that reason, Justice Barrett distinguished between a challenge to guidance documents (which may be brought in district court under the APA) and a challenge to grant terminations themselves (which belongs exclusively in the Court of Federal Claims under the Tucker Act). *Id.*

### C. The Nature Of The Relief Sought

Now consider the districts' prayer for relief, which confirms what the asserted right and injury already show. Primarily, the complaints ask the district court to enjoin the Department from "conditioning, terminating, freezing, or otherwise impeding" access to federal funds and to "[r]equire that Defendants immediately pay . . . any funds that have been denied." J.A. 39, 256. In other words, the districts demand the money their awards promised, paid the way they used to be paid. That remedy is founded upon their grant contracts. The Tucker Act precludes us from granting such relief.

The rest of the prayer fares no better. The complaints further ask the district court to set aside the districts' high-risk designations and to declare that the districts have not violated Title IX. J.A. 38, 255–56. Those requests travel the same road one step earlier. They seek the same result as the injunction: restoring advance payment. If we set aside the designations or declared that the districts complied with the condition, the money would move as it did before. We have long refused to honor this maneuver: "Claims Court jurisdiction cannot be avoided by framing an essentially monetary claim in injunctive or declaratory terms." *Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 474 (4th Cir. 1983); *see also Nat'l Insts. of Health*, 145 S. Ct. at 2661 (Barrett, J., concurring); *Sustainability Inst.*, 165 F.4th at 825. The court below noted that "almost every time" the districts' briefing mentions the high-risk designation, they tie it to "the effect that this determination has had or will have on the disbursement of federal funds." J.A. 221. Even these artfully crafted complaints cannot conceal what the districts want: They seek money owed under grant contracts. The contractual nature of that relief underscores why these claims belong in the Court of Federal Claims.[4]

Nor can the districts recast their claims as asserting a freestanding right not to be labeled high-risk. The high-risk designation only triggers the reimbursement payment terms. The Secretary of Education has discretionary authority to set these grants' payment method. 20 U.S.C. § 1226a-1. The implementing regulations permit a federal agency or

[4] The Declaratory Judgment Act cannot save the districts' claims. That statute supplies a remedy; it cannot confer jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950). Any jurisdiction for a declaratory judgment rises or falls with jurisdiction over the APA claims.

pass-through entity to adjust a grant from "advance payments" to "reimbursements" for a variety of reasons, including after "review of its risk assessment." 2 C.F.R. § 200.208(b)(1), (c)(1). The regulation requires notice and an explanation of what the recipient must do to get back to advance payments. § 200.208(d). If the recipient takes those steps, then the agency must restore advance payments. § 200.208(e). The high-risk designation is no free-floating regulatory status that the districts can challenge independent of their contracts. It is merely the means by which the Department modified the payment of these grants. We have seen this move before. And we have made clear that coupling contractual claims with requests for other equitable relief does not give a district court jurisdiction over claims founded upon contract. *Portsmouth*, 706 F.2d at 474.

**D. The Districts' Claims Are Not Founded Upon Title IX**

Title IX grants the districts no substantive rights. On the contrary, it creates *obligations* that the districts consented to in exchange for federal funds. 34 C.F.R. § 106.4. Title IX "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). We have said the same: "'[I]n return for federal funds, the States agree to comply with [Title IX's] conditions.'" *Litman*, 186 F.3d at 551 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). That contractual relationship forms the foundation of the districts' claims. *See Solutions in Hometown Connections*, 165 F.4th at 844.

The nondiscrimination rights created by Title IX belong to victims of discrimination, not to funding recipients like the districts. *See Cannon v. Univ. of Chicago*,

441 U.S. 677, 694 (1979). The districts' belief that the Department has demanded something inconsistent with Title IX is not an assertion of a Title IX right. Instead, the districts' real claim is that the Department misinterpreted the conditions of their contracts.

Title IX applies to school districts only through contract. Because Title IX is a Spending Clause statute, it carries no "independent regulatory force"; its binding effect depends entirely on knowing and voluntary agreement. *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1944 (2026); *cf. Medina v. Planned Parenthood South Atl.*, 606 U.S. 357, 369–81 (2025). Here, the school districts became bound by Title IX only by accepting federal funds on the condition that they comply with its requirements. When the Department found the districts' bathroom policies contrary to Title IX, it designated the districts as "high-risk" and effectuated Title IX by modifying the grants' payment method. Without the grant agreements, the Department has no leverage to force the districts to adopt different bathroom policies. So when the Department "enforces" Title IX by changing how it pays a recipient's grants, it is administering the bargain it struck. And a recipient that calls the enforcement improper is complaining about its bargain.

The districts do not allege that the Department violated any rights guaranteed by Title IX. They object to the change in how their grants are paid. The Department's Title IX finding matters only because compliance with Title IX is a condition of the districts' contracts. So whatever the Department's justification, the districts' injury is founded upon those contracts. And any relief will flow from those contractual rights.

In the end, the districts want their grants paid in the manner previously used. Their claims allege injury to a right that can be found only in their grant contracts. And any

remedy for the districts would be based on that contractual right. The need to interpret Title IX along the way does not make these claims any less founded upon contract. So they belong exclusively in the Court of Federal Claims.[5]

The majority sees it differently. It reasons that the districts' claims are "based on Title IX," not on their grants. Majority Op. 21. But the majority confuses the reason the Department's conduct is allegedly unlawful with the source of the districts' asserted right to relief. True, the Department may be misinterpreting Title IX. But that is still a dispute about what the grants' condition means.

The Tucker Act cannot turn on how a plaintiff frames its claim. *See Portsmouth*, 706 F.2d at 474. Rather, it asks what the claim is "founded . . . upon." 28 U.S.C. § 1491(a)(1). Even if a plaintiff points to an alleged statutory misinterpretation, the claim is founded upon contract if the contract itself creates the right being vindicated. *Sustainability Institute* held exactly that. The plaintiffs there invoked statutes, regulations, and the Constitution. But we recognized that their APA claims seeking to restore the grants were in essence contractual because they identified "no source of law, besides their grant agreements, guaranteeing them the relief they [sought]." *Sustainability Inst.*, 165 F.4th at

---

[5] In *Portsmouth*, the Department of Housing and Urban Development withheld a housing authority's operating subsidies based on its refusal to comply with a statute. 706 F.2d at 472–73. The authority sued in district court, claiming HUD erred in concluding that the statute applied. *Id.* at 473. We held that the claim belonged in the Claims Court. *Id.* at 473–75. Its "gravamen," we explained, was "that HUD cannot modify its contractual obligation to pay operating subsidies by unilaterally altering the terms of the [contract]." *Id.* at 474. That the case turned on "some questions of federal law" did not change that the claim was founded upon contract. *Id.* So too here. The districts say the Department cannot change how it pays them by invoking a statute it has misread. That is *Portsmouth*'s claim with a different statute.

827. Here, rather than ask what these claims are founded upon, as the Tucker Act requires, the majority stops at the *reason* the Department's actions were allegedly unlawful: misinterpreting Title IX. The majority asks the wrong question, and that leads to the wrong answer.

Compounding its error, the majority misapplies *Crowley* to suggest that the districts' claims merely "presuppose" a contract. Majority Op. 16 (quoting *Crowley*, 38 F.4th at 1110). But each claim here "seeks to vindicate" a contract. *Crowley*, 38 F.4th at 1110. A claim "presupposes" a contract when the agreement sits in the background while an independent source supplies the right to be vindicated. For example, in *Crowley*, the Transportation Act supplied a statutory limit on GSA's bill-auditing authority separate and apart from any contract. *Id.* at 1108–09. But here, the award relationship supplies the asserted right (payment on the prior terms), measures the alleged injury (a change in those terms), and defines the requested remedy (their restoration). Without the grant awards, a high-risk designation would violate no right, cause no injury, and warrant no remedy.

The majority gives weight to the fact that the districts did not assert that the grant terms themselves require prepayment. Majority Op. 15. But it is not clear to me that the grants are silent on the matter. *Cf.* 2 C.F.R. §§ 200.305, 200.211(c)(1)(i). And whether the grant terms guarantee advance payment is a merits question about the districts' contractual rights. A claim that turns on the rights an agreement confers is a quintessential contracts claim. The possibility that the districts may lack the asserted contractual entitlement on the merits does not open the door to district-court jurisdiction. *Cf. Bell v. Hood*, 327 U.S.

678, 682 (1946). The need to examine what the contracts say, and what rights they confer, demonstrates that these claims are founded upon contract.

At this stage, we are assessing jurisdiction. The jurisdictional question asks whether the right the districts seek to vindicate is independent of their federal awards. *See J&E Salvage*, 55 F.3d at 988–90. The right alleged here relates to the payment of the promised funds. These claims are founded upon contract, and the district court lacks jurisdiction to adjudicate them.[6]

The majority disagrees. But I cannot tell which claim it believes was properly brought in federal district court. It says only that the districts "have asserted some claims that are not at their essence contractual." Majority Op. 22–23. Which claim or claims? The majority does not say. We are left, then, with a claim that must not be named. I do not envy the district court's task of identifying it.[7]

---

[6] The districts respond that the Court of Federal Claims cannot give them everything they want. Perhaps. But that is Congress' choice, not a defect to be cured by a district court exercising jurisdiction under the APA. "When Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012) (cleaned up). We applied that principle earlier this year. *Sustainability Inst.*, 165 F.4th at 828 n.7. We should do so today as well.

[7] Perhaps the district court will recognize that it must dismiss any claim demanding advance payment, as that is most plainly founded upon contract. But then all that is left is the Department's letter informing the districts of their Title IX violations and the start of administrative proceedings. That administrative charge is not final agency action. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241–43 (1980). Indeed, the Department's enforcement proceeding remains ongoing. Majority Op. 17 n.4. With no final agency action, there are no APA claims at all and nothing for the district court to do. 5 U.S.C. § 704; *see Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024).

## II. SECTION 1683

Section 1683 does not change the conclusion that these claims belong in the Court of Federal Claims. *See* 20 U.S.C. § 1683. Section 1683 offers two avenues for judicial review. Neither leads to district court here. First, actions "taken pursuant to section 1682 . . . shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds." *Id.* Second, when an action "terminating or refusing to grant or to continue financial assistance" is "not otherwise subject to judicial review," one "may obtain judicial review . . . in accordance with [the APA]." *Id.*

Start with the first avenue. The Department says that it did not act "pursuant to section 1682." That provision states that "[c]ompliance with" Title IX "may be effected (1) by the termination of or refusal to grant or to continue assistance . . . or (2) by any other means authorized by law." 20 U.S.C. § 1682. The record suggests that the Department was enforcing Title IX. Its investigatory letter stated that the Department "enforces Title IX" and that, "[a]s recipients of federal financial assistance from the Department of Education, the [districts] must comply with this law and its implementing regulations." J.A. 78; *see also* J.A. 82 (citing 20 U.S.C. § 1682) ("Title IX also empowers and directs Federal departments and agencies to issue and enforce regulations to effectuate the provisions of Title IX.").

The Department now claims that its high-risk designations fall outside § 1682 because the Secretary did not actually terminate, refuse to grant, or discontinue the funds. The Secretary did exercise discretionary authority under 20 U.S.C. § 1226a-1 to change

the payment method. *See also* 2 C.F.R. § 200.208(c). But § 1682 allows enforcement of Title IX "by any other means authorized by law." 20 U.S.C. § 1682. So the Department may have acted to "enforce" Title IX through discretionary action authorized by § 1226a-1. I need not decide whether the Department acted pursuant to § 1682. Even if it did, the first avenue of § 1683 does not provide an independent basis for district-court jurisdiction. The statute simply preserves whatever judicial review would "otherwise be provided by law for similar action taken . . . on other grounds." 20 U.S.C. § 1683. Suppose the Department imposed the same reimbursement terms for a reason unrelated to Title IX, like weak financial controls. A claim to enforce the same asserted right to advance payment would still be founded upon the award. This first avenue thus leads directly back to the Court of Federal Claims.[8]

Now look at the second avenue. It reaches only actions "terminating or refusing to grant or to continue financial assistance" and only when the action is "not otherwise subject to judicial review." § 1683. The districts argue this provision grants them the right to APA review. But the second avenue does not help the districts either. Nothing was terminated. Nothing was refused. The districts still receive their funds; they just receive them by

[8] The majority points toward 20 U.S.C. § 1234g. Majority Op. 11, 22 n.7. But § 1234g does not help here. First, § 1234g provides judicial review of certain final agency action relating to recovery of funds, withholding of funds, and cease-and-desist orders. §§ 1234g(a), 1234a, 1234d, 1234e. The districts, correctly, do not claim that any of these provisions apply here. And second, § 1234g provides for review in the court of appeals, not the district court. § 1234g(b). The question in this case is whether the *district court* has jurisdiction. It is true that when a more specific directive like §§ 1683 and 1234g applies, then it will supersede the Tucker Act's baseline rule. *See United States v. Bormes*, 568 U.S. 6, 12–13 (2012). But because none applies here, the Tucker Act controls.

reimbursement. And even if a change in payment method could be considered a termination or refusal, judicial review is "otherwise" available in the Court of Federal Claims.

The districts assert that the Court of Federal Claims cannot offer "judicial review" because it is not an Article III court with life-tenured judges. But judicial review is not so narrowly defined. The Tucker Act itself says that the Court of Federal Claims is a court with "jurisdiction to render judgment." 28 U.S.C. § 1491(a)(1). And Congress elsewhere directs the exercise of "judicial power of the United States Court of Federal Claims." 28 U.S.C. § 174. The Supreme Court likewise has described review in non-Article III tribunals as "judicial review." *Hinck v. United States*, 550 U.S. 501, 506–07 (2007) (Tax Court). And judgments of the Court of Federal Claims are appealable to an Article III court, the Federal Circuit. 28 U.S.C. § 1295(a)(3). Because judicial review is available in the Court of Federal Claims, § 1683's second avenue never opens.

* * *

Strip back the veneer, and the districts' claims are simple: They want their contractual payments made in advance, as before. Those claims are founded upon contract, and Congress has assigned them to the Court of Federal Claims. By dismissing this case, the district court did what the Tucker Act, the Supreme Court's recent orders, and our own precedents required. I respectfully dissent.